Filed 8/13/18

# IN THE SUPREME COURT OF CALIFORNIA

EDUARDO DE LA TORRE et al.,      )
     )
     Plaintiffs and Appellants,      )
     )      S241434
     v.      )
     )      9th Cir. No. 14-17571
CASHCALL, INC.,      )
     )      D.C. No. 3:08-cv-03174-MEJ
     Defendant and Respondent.      )
_____)

Under California law, can a loan contract include an interest rate term so high that it is "unreasonably and unexpectedly harsh," "unduly oppressive," or "so one-sided as to shock the conscience"? (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910–911 (*Sanchez*).) What the Ninth Circuit asks us to resolve in this case is a more specific version of that question: Can the interest rate on consumer loans of $2,500 or more render the loans unconscionable under section 22302 of the Financial Code? The answer is yes. An interest rate on a loan is the price of that loan, and "it is clear that the price term, like any other term in a contract, may be unconscionable." (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 926 (*Perdue*).)

Although California sets interest rate caps only on consumer loans less than $2,500, we do not glean from the statute setting those rates — section 22303 of the Financial Code — the implication that a court may never declare unconscionable

1

an interest rate on a loan of $2,500 or more.[1]  Nothing in our unconscionability doctrine, in section 22303, its neighboring section 22302, or anything else shedding light on the purpose of the relevant statutes supports such a reading. Indeed, when read together, sections 22302 and 22303 tend to show how the Legislature's purpose in enacting these provisions was to free larger-denominated debts from the rigid regulation of usury rates, without rendering irrelevant to those transactions the flexible standard of unconscionability long rooted in both statutes and California common law.  We recognize how daunting it can be to pinpoint the precise threshold separating a merely burdensome interest rate from an unconscionable one.  But that is no reason to ignore the clear statutory embrace here of a familiar principle — that courts have a responsibility to guard against consumer loan provisions with unduly oppressive terms.  (*Perdue*, *supra*, 38 Cal.3d at p. 925.)

That responsibility is one courts must pursue with caution.  Unsecured loans made to high-risk borrowers often justify high rates.  Both consumers' acceptance of such rates, as well as restrictions on them, may trigger unintended consequences.  (See, e.g., Bhutta et al., *Consumer Borrowing after Payday Loan Bans* (2016) 59 J. Law & Econ. 225, 247 [finding that "although payday loan regulations reduce the usage of payday loans, many consumers turn to other forms of high-interest credit"].)  Wary of such consequences and cognizant of the limits of its power, a court declares unconscionable only those interest rates that — in light of the totality of a transaction's bargaining context — are so "unreasonably and unexpectedly harsh" as to be "unduly oppressive" or "shock the conscience." (E.g., *Sanchez*, *supra*, 61 Cal.4th at pp. 910–911.)  But nothing in California law

---

[1]    All further references to sections 22302 and 22303 are to the Financial Code.

prohibits a court from making an inquiry into the nature of a consumer loan agreement of at least $2,500 and the interest rate provided therein.

## I.

Defendant CashCall, Inc. (CashCall) is a lender of consumer loans to high-risk borrowers. One of CashCall's signature products was an unsecured $2,600 loan, payable over a 42-month period, and carrying an annual percentage rate (APR) of either 96 percent or, later in the class period, 135 percent. People who took out such loans from CashCall were "consumers with low credit scores," living "under financial stress." (*De La Torre v. CashCall, Inc.* (N.D.Cal. 2014) 56 F.Supp.3d 1073, 1085 (*CashCall*).) CashCall attracted many such borrowers through its television advertisements, which "capitalize[d] on the viewer's need to get money quickly." (*Ibid.*)

In bringing this lawsuit in the federal district court for the Northern District of California, plaintiffs Eduardo De La Torre and Lori Saysourivong do not contend CashCall's advertising was deceptive. Nor do they claim CashCall failed to disclose accurately the terms of the loan as required by federal law. What plaintiffs allege instead is that CashCall violated California's Unfair Competition Law (UCL). The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) Plaintiffs bring their claim under the "unlawful" prong of the UCL and assert that CashCall's lending practice was unlawful because it violated section 22302, the section that applies the unconscionability doctrine to consumer loans.

The district court certified plaintiffs' lawsuit as a class action. It defined the class as those borrowers who took out loans from CashCall of at least $2,500 "at an interest rate of 90% or higher." (*CashCall*, *supra*, 56 F.Supp.3d at p. 1082 [defining as a class " '[a]ll individuals who while residing in California borrowed from $2,500 to $2,600 at an interest rate of 90% or higher from CashCall for

3

personal family or household use at any time from June 30, 2004 through July 10, 2011' "].) Because the class was defined by the interest rate paid by its members, the interest rate became the crucial term on which the parties and the courts trained their attention.

After class certification, CashCall moved for summary judgment on plaintiffs' unfair competition claim. It argued "Plaintiffs have failed to establish that [CashCall's] interest rates are unconscionable as a matter of law." (*CashCall*, *supra*, 56 F.Supp.3d at p. 1086.) The district court initially denied the motion, as "there [were] disputed questions of fact with regard to both the procedural and substantive unconscionability inquiries." (*Id.* at p. 1104.)

But the court changed its mind when CashCall made a motion for reconsideration. The court now agreed with CashCall that "the UCL cannot be used as a basis for Plaintiffs' Unconscionability Claim because ruling on that claim would impermissibly require the Court to regulate economic policy." (*De La Torre v. CashCall, Inc.* (N.D.Cal. 2014) 56 F. Supp. 3d 1105, 1107.) In reaching this conclusion, the court reasoned it could not fashion a remedy under the UCL "without deciding the point at which CashCall's interest rates crossed the line into unconscionability." (*Id.* at pp. 1109–1110.) The court emphasized that, in enacting section 22303, "[t]he California Legislature long ago made the policy decision not to cap interest rates on loans exceeding $2,500." (*Id.* at p. 1109.) To decide the point at which "CashCall's interest rates crossed the line into unconscionability," said the court, would be to "second-guess" the Legislature and "impermissibly intrud[e] upon [its] province" to forge economic policy through legislation. (*Ibid.*) As such, "[e]ven if Plaintiffs were able to prove that the challenged loans were unconscionable," their claim would "fail[] as a matter of law." (*Ibid.*) The court therefore granted CashCall's motion for summary judgment.

Plaintiffs appealed. After reviewing the parties' arguments, the Ninth Circuit certified to us this question: "Can the interest rate on consumer loans of $2500 or more governed by California Finance Code § 22303, render the loans unconscionable under California Finance Code § 22302?" (*De La Torre v. CashCall, Inc.* (9th Cir. 2017) 854 F.3d 1082, 1085.) For the reasons that follow, we answer the Ninth Circuit's question in the affirmative: an interest rate on consumer loans of $2,500 or more may be deemed unconscionable under Financial Code section 22302.

## II.

As long established under California law, the doctrine of unconscionability reaches contract terms relating to the price of goods or services exchanged. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1145 (*Sonic II*) ["the unconscionability doctrine is concerned . . . with [among other things] 'unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction' "]; *Perdue*, *supra*, 38 Cal.3d at p. 926 ["the price term, like any other term in a contract, may be unconscionable"]; *Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 82 (*Carboni*) ["at some point the price becomes so extreme that it is unconscionable"]; see also *Jones v. Star Credit Corp.* (Sup.Ct. 1969) 298 N.Y.S.2d 264, 266 ["no other provision of an agreement more intimately touches upon the question of unconscionability than does the term regarding price"].) Whether the price of a bargain is "unreasonably and unexpectedly harsh" depends on more than just a single printed number, so we examine not only the price term itself but other provisions and circumstances affecting a transaction's benefits and burdens. (See *Perdue*, *supra*, 38 Cal.3d at pp. 926–927 ["Allegations that the price exceeds cost or fair value, standing alone, do not state a cause of action. [Citations.] Instead, plaintiff's case will turn upon

5

further allegations and proof setting forth the circumstances of the transaction," including "the basis and justification for the price."].)

An interest rate is the price charged for lending a particular amount of money to a given individual or entity. (*Carboni*, *supra*, 2 Cal.App.4th at p. 82, fn. 7 [quoting Corbin, Contracts (1963) § 129, p. 556].) As with any other price term in an agreement governed by California law, an interest rate may be deemed unconscionable. (*Boyce v. Fisk* (1895) 110 Cal. 107, 112 (*Boyce*) ["No doubt the excess of interest is a circumstance which, coupled with others tending to show actual fraud, or such circumstances of oppression and overreaching as warrant the inference of undue advantage, is sufficient cause for setting aside a contract."]; *Bridge v. Kedon* (1912) 163 Cal. 493, 498 (*Bridge*) ["where it is a loan and the interest is exorbitant, or the terms unconscionable, the courts will compel each party to do equity"]; *Carboni*, *supra*, 2 Cal.App.4th at pp. 81–82, fn. 5 ["We can see no reason why interest rate provisions should be exempt from the general rules of unconscionability . . . ."].)

CashCall's arguments to the contrary fail to persuade us. Although section 22303 sets maximum interest rates only on loans less than $2,500, whether an interest rate is unconscionable is fundamentally a different inquiry than whether the rate exceeds a numerical cap. Unconscionability is a flexible standard in which the court looks not only at the complained-of term but also at the process by which the contractual parties arrived at the agreement and the larger context surrounding the contract, including its "commercial setting, purpose, and effect." (Civ. Code § 1670.5, subd. (b); *Sanchez*, *supra*, 61 Cal.4th at pp. 911–912 ["An evaluation of unconscionability is highly dependent on context. . . . The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, *in view of all relevant circumstances*, that a court should withhold enforcement." (italics added)]; *Perdue*, *supra*, 38 Cal.3d at p. 926 ["a claim of unconscionability

6

often cannot be determined merely by examining the face of the contract, but will require inquiry into its setting, purpose, and effect"]; see also *Drogorub v. Payday Loan Store of WI, Inc.* (Wis.Ct.App. 2012) 826 N.W.2d 123 [2012 Wisc. App. LEXIS 1002*, *11] [agreeing with the lower court that "while a 294% interest rate is not per se unconscionable, it is unconscionable under the facts of this case"]; *James v. Nat'l Fin., LLC* (Del.Ch. 2016) 132 A.3d 799, 816–817, 826–837 [similar].) In contrast, an interest rate cap is a bright-line rule policing a single facet of loan agreement. As such, just because loans of at least $2,500 are not subject to a numerical ceiling on the interest rate does not mean that they cannot be found unconscionable. The Legislature made this clear when it enacted section 22302 — which applies the unconscionability doctrine to all consumer loans — at the same time that it lifted interest caps on loans exceeding $2,500.

So we conclude plaintiffs have indeed stated a cause of action in this litigation by bringing an unfair competition claim that alleges a violation of section 22302 due to an unconscionably high interest rate. To arrive at this conclusion, we consider the Financial Code, the UCL, and the unconscionability doctrine itself.

### A.

The Financial Code governs the consumer loans at issue here. But the roots of the unconscionability doctrine long predate existing statutory provisions. The doctrine can be traced back to Roman law and, more recently, English common law. (Atty. Gen. Amicus Brief, at p. 9, fn. 3; Orozco, Note, *The Judicial Expansion of an Old Tool to Combat Predatory Lending in New Mexico* (2016) 46 N.M. L.Rev. 191, 196.) During the 19th century, both our court and the United States Supreme Court recognized that a price agreed upon in a contract may be unconscionable. (See *Hume v. United States* (1889) 132 U.S. 406, 414–415

7

[affirming a trial court's decision to allow the plaintiff to recover only the market value of the goods and not the agreed-upon contract price, which at "thirty-five times their highest market value," was "extortionate and unconscionable on their face"]; *Boyce*, *supra*, 110 Cal. at p. 112; see also *Scott v. United States* (1871) 79 U.S. 443, 445 ["If a contract be unreasonable and unconscionable, but not void for fraud, a court of law will give to the party who sues for its breach damages, not according to its letter, but only such as he is equitably entitled to."]; *Baxter v. Wales* (1815) 12 Mass. 365, 367 ["The agreement to pay at the rate of six dollars *per annum* for the use of the cattle, as stipulated in each note, in case the defendant should fail to perform his contract at the end of the year, was unconscionable . . . ."].) Long before unconscionability was incorporated into the relevant provision of the Financial Code, courts appeared to have recognized that the justification for unconscionability was to protect social welfare. (See, e.g., Schmitz, *Embracing Unconscionability's Safety Net Function* (2006) 58 Ala. L.Rev. 73, 105, 80 [arguing that "excessively high prices relative to goods or services purchased often indicate market failures" and documenting that early courts developed an " 'equitable conception of contract,' which deemed 'unjust' the payment of prices outside the relevant customary range"].)

In 1985, the Legislature approved Senate Bill 447, enacting into law the current versions of sections 22302 and 22303. Before the bill's passage, the Legislature had set maximum interest rates for consumer loans up to $5,000. The bill, as codified at section 22303, lowered this threshold to $2,500. In fact, section 22303 accomplished two things. First, it set various numerical maximums on interest rates for loans ranging from less than $250 to more than $1,650; second, it specified that the section "does not apply to any loan of a bona fide principal

amount of two thousand five hundred dollars ($2,500) or more."[2]  So, while a lender such as CashCall may charge, at most, "[o]ne percent per month" (§ 22303, subd. (d)) on the last dollar lent on a loan just shy of $2,500, it escapes the rigid restriction of the usury law by lending just a little more and pushing the loan amount to at least $2,500.

Just as the Legislature was enacting section 22303, it also approved an amendment with precisely the same language found in section 22302 today.  The amendment (now section 22302) consists of two subdivisions.  The first subdivision applies the unconscionability doctrine to consumer loans.  (Fin. Code, § 22302, subd. (a) ["Section 1670.5 of the Civil Code applies to the provisions of a loan contract that is subject to this division."].)  The second provides that an unconscionable loan violates the consumer lending law and subjects the lender "to the remedies specified in this division."  (Fin. Code, § 22302, subd. (b) ["A loan

---

[2]    In its entirety, section 22303 reads:  "Every licensee who lends any sum of money may contract for and receive charges at a rate not exceeding the sum of the following:
>   "(a) Two and one–half percent per month on that part of the unpaid principal balance of any loan up to, including, but not in excess of two hundred twenty–five dollars ($225).
>   "(b) Two percent per month on that portion of the unpaid principal balance in excess of two hundred twenty–five dollars ($225) up to, including, but not in excess of nine hundred dollars ($900).
>   "(c) One and one–half percent per month on that part of the unpaid principal balance in excess of nine hundred dollars ($900) up to, including, but not in excess of one thousand six hundred fifty dollars ($1,650).
>   "(d) One percent per month on any remainder of such unpaid balance in excess of one thousand six hundred fifty dollars ($1,650).

"This section does not apply to any loan of a bona fide principal amount of two thousand five hundred dollars ($2,500) or more as determined in accordance with Section 22251."

found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed to be in violation of this division and subject to the remedies specified in this division."].)

Both subdivisions of section 22302 refer to Civil Code section 1670.5, the statutory codification of the unconscionability doctrine.[3] While Civil Code section 1670.5 is a verbatim enactment of Section 2-302 of the Uniform Commercial Code (UCC), its adoption in California in 1979 as part of the Civil Code made unconscionability a doctrine applicable to all contracts. (See Prince, *Unconscionability in California: A Need for Restraint and Consistency* (1995) 46 Hastings L.J. 459, 490–493 [reviewing the legislative history of Civil Code section 1670.5]; *IMO Development Corp. v. Dow Corning Corp.* (1982) 135 Cal.App.3d 451, 459–460 [same].) What section 1670.5 makes clear is that a court may find unconscionable "the contract" or "any clause of the contract" and so refuse enforcement. (Civ. Code, § 1670.5, subd. (a); see also Assem. Leg. Com., com. on Assem. Bill 510 (1979-1980 Reg. Sess.) reprinted in Deering's Ann. Civ. Code (2005 ed.) foll. § 1670.5, p. 383 ["Section 1670.5 is intended to make it possible

---

[3]    Civil Code section 1670.5 states:

"(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

10

for the courts to police explicitly against the contracts or clauses which they find to be unconscionable."].)

By incorporating Civil Code section 1670.5, section 22302 applies the unconscionability doctrine to contract terms in a consumer loan agreement. To wit: unconscionability "applies to the provisions of a loan contract that is subject to this division." (Fin. Code, § 22302, subd. (a).) The "division" at issue is Division 9 of the Financial Code, the part of the Code that regulates loans made to consumers.[4] (See Fin. Code, § 22200 et seq.) Not only does section 22302 apply the unconscionability doctrine to consumer loans, it applies the doctrine to "the provisions of a loan contract," one of which is undeniably the interest rate on the loan. (See Fin. Code, § 22200 [defining the "charges" on a loan to include the interest received in making the loan].) So under its ordinary terms, section 22302 applies the unconscionability doctrine to the interest rate on a consumer loan. At least here, there is no question regarding to what exactly the term "applies" applies — both that term and its context support the conclusion that it was the Legislature's purpose to leave unconscionability as a relevant consideration in cases involving interest rates in consumer loans. In addition, because section 22302 imposes no restriction on the amount of money lent under the contract, the interest rate on a consumer loan — even one of at least $2,500 — may render the loan unconscionable.

CashCall resists this conclusion, contending that section 22302 "has nothing to do with interest rates." To support its position, CashCall mounts a blunderbuss attack on whether "the Legislature intended for courts to make determinations of unconscionability" under section 22302 at all. CashCall begins

---

[4]     Division 9 of the Financial Code was previously known as the California Finance Lenders Law. The Legislature renamed it the California Financing Law in 2017. (Stats. 2017, ch. 475, § 4, p. 3575.)

with a kernel of truth, pointing out that under section 22302 unconscionable loans are "subject to the remedies of this division."  Since "[t]here is no private right of action to enforce 'the remedies of this division,' " CashCall contends that plaintiffs cannot litigate their unconscionability claims in court.

But plaintiffs are neither bringing a cause of action under the Financing Law nor seeking remedies under that division.  Instead, plaintiffs advance an unfair competition claim under the UCL.  The claim is premised on unlawful business conduct, which section 17200 of the UCL proscribes.  (Bus. & Prof. Code, § 17200; *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383.)  By prohibiting unlawful business practices, " 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable."  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).)  In this case, section 22302 supplies the requisite "violations of other laws" by making "[a] loan found to be unconscionable" a violation of the Financing Law.  (Fin. Code, § 22302, subd. (b).)  The UCL, in turn, makes that violation "independently actionable."  (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.)  So the fact that section 22302 does not provide for a private cause of action is immaterial since "it is in enacting the UCL itself, and not by virtue of particular predicate statutes, that the Legislature has conferred upon private plaintiffs 'specific power' [citation] to prosecute unfair competition claims."  (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 562.)  Similarly, it does not matter that plaintiffs cannot recover the remedies made available under section 22302.  Plaintiffs are not praying for remedies under section 22302.  They are seeking UCL remedies — restitution and injunctive relief — which are recoverable "cumulative" of any other remedies.  (Bus. & Prof. Code, §§ 17203, 17205.)

12

Nor does it help CashCall to argue that Civil Code section 1670.5 merely codifies the defense of unconscionability without providing for an affirmative cause of action. Whatever merit underlies the claim, it proves irrelevant where a different statute — here, section 22302 — expressly provides that an unconscionable loan breaks the law and the UCL supplies a cause of action to police such unlawful conduct. (Fin. Code, § 22302, subd. (b); *Cel-Tech*, *supra*, 20 Cal.4th at p. 180; see also *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 217–218 (*California Grocers*) [assuming without deciding that the UCL encompasses an affirmative cause of action for unconscionability]; *Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1540 [same]; *Freeman v. Ow* (N.D.Cal. Nov. 16, 2016, No. 16-cv-04817-JST) 2016 U.S.Dist.LEXIS 159572, at *21-22, fn. 3 [" '[w]hile unconscionability cannot stand alone, it can be the basis for another claim' "].)

So Plaintiffs have stated a cause of action by basing their UCL claim on the allegation that the interest rate on CashCall's consumer loans of at least $2,500 rendered the loans unconscionable under section 22302.

## B.

Our conclusion holds even when we consider section 22302 in light of the interest rate caps imposed in section 22303. Section 22303 imposes strict limits on the interest rates charged on loans less than $2,500. The section, however, expressly states that it does not apply to any loan of $2,500 or more. By providing that it "does not apply to any loan of a bona fide principal amount of two thousand five hundred dollars ($2,500) or more," section 22303 seems to mean what it says: the section does not apply to loans of $2,500 or more. (See *Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157 (*Larkin*) ["In interpreting a statute, we begin with its text, as statutory language typically is the best and most reliable

13

indicator of the Legislature's intended purpose."]; *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 956 [same]; *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1379 (*Klein*) [stating in the context of another statute that "[b]y its terms, the statute only applies to transactions involving 5,000 or more gallons of motor fuel and therefore has no application to transactions involving lesser quantities of motor fuel"].)  As such, whether the interest rate on a loan of $2,500 or more may render the loan unconscionable is a question that section 22303 expressly avoids answering.

CashCall's interpretation would stand section 22303 on its head. According to CashCall, because section 22303 "expressly considers loans of $2,500 or more and declares that they are not subject to any rate cap," such loans cannot be unconscionable due to their rate.  In essence, CashCall argues that by stating that section 22303 does not apply to loans of $2,500 or more, the Legislature actually meant to say that section *22302* does not apply to interest rates.  More still, CashCall's argument rests on an assumed — but false — equivalence between interest rate caps and unconscionability:  if an interest rate is not capped, it cannot be unconscionable.  CashCall cites no apposite authority to support its position.  (Contra *West Pico Furniture Co. v. Pacific Finance Loans* (1970) 2 Cal.3d 594 [deciding only that a statute making interest rate caps inapplicable to loans over $5,000 means that plaintiff's *usury* claim must fail]; *Carter v. Seaboard Finance Co.* (1949) 33 Cal.2d 564 [similar]; *Raysinger v. People Inv. & Loan Assn.* (1973) 36 Cal.App.3d 248 [similar].)  And for good reason, as the argument belies a misunderstanding as to what unconscionability means.

Unconscionability is a flexible doctrine.  It is meant to ensure that in circumstances indicating an absence of meaningful choice, contracts do not specify terms that are "overly harsh," "unduly oppressive," or "so one-sided as to

14

shock the conscience." (*Sanchez*, *supra*, 61 Cal.4th at p. 910; *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 484 (*A & M Produce*) ["Unconscionability is a flexible doctrine designed to allow courts to directly consider numerous factors which may adulterate the contractual process."].) It is true that unconscionability has been subject to "various nonexclusive formulations" (*Sonic II*, *supra*, 57 Cal.4th at p. 1060; *Sanchez*, *supra*, 61 Cal.4th at p. 911) and differing analytical approaches. (See *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305, 1317–1319 (*Morris*) [documenting the use of the two approaches in California]; *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817–820 [explaining the older approach to finding unconscionability]; *A & M Produce*, *supra*, 135 Cal.App.3d at pp. 486–487 [explaining the alternative framework that has been described as conforming more closely to the UCC]; *Perdue*, *supra*, 38 Cal.3d at p. 925, fn. 9 [stating that both approaches "should lead to the same result"].) Nonetheless, at least one thing about the doctrine is clear: it requires more than just looking at one particular term in a contract, comparing it to a fixed benchmark, and declaring the term unconscionable.

Instead, unconscionability requires oppression or surprise — that is, procedural unconscionability — along with the overly harsh or one-sided results that epitomize substantive unconscionability. (E.g., *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*) [explaining that " 'unconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results" and the two elements " 'must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine' "]; *Sonic II*, *supra*, 57 Cal.4th at p. 1133; *Sanchez*, *supra*, 61 Cal.4th at p. 910.) Some measure of both procedural and substantive unconscionability must be present — although

15

given the sliding-scale nature of the doctrine, more of one kind mitigates how much of the other kind is needed. (*Armendariz*, *supra*, 24 Cal.4th at p. 114; *Sanchez*, *supra*, 61 Cal.4th at p. 910.) Even where a party complains of a single contract clause, the court usually must still examine the bargaining process for any procedural unfairness. (See *Sanchez*, *supra*, 61 Cal.4th at p. 912 ["the substantive unfairness of the terms must be considered in light of any procedural unconscionability"]; *Morris*, *supra*, 128 Cal.App.4th at p. 1319 ["Because procedural unconscionability must be measured in a sliding scale with substantive unconscionability, our task is not only to determine *whether* procedural unconscionability exists, but more importantly, *to what degree* it may exist."].) The court must consider whether there was (1) undue oppression arising from "an inequality of bargaining power," including the various factors tending to show relative bargaining power such as the parties' sophistication, their cognitive limitations, and the availability of alternatives; and (2) surprise owing to, for example, the "terms of the bargain [being] hidden in a prolix printed form" or pressure to hurry and sign. (*A & M*, *supra*, 135 Cal.App.3d at p. 486; see also, e.g., *Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 97, 111 [holding that the plaintiff has shown a triable issue of procedural conscionability when he introduced evidence that he "had an eighth grade education in Mexico," limited English, did not understand what he was signing, and the loan process " 'went very fast,' " with the mortgage brokers not giving " 'too good of an explanation' "].) In short, a determination of procedural unconscionability may well be "highly dependent on context," very much different than deciding whether a certain rate cap applies.[5] (*Sanchez*, *supra*, at pp. 911–912; *Perdue*, *supra*, 38

---

[5] To the extent that CashCall argues individual borrowers' circumstances relevant to a procedural unconscionability determination would create

16

Cal.3d at p. 926; *A & M*, *supra*, 135 Cal.App.3d at p. 489 ["while unconscionability is ultimately a question of law, numerous factual inquiries bear upon that question"].)

In assessing the presence of substantive unconscionability, a court may also need to consider context. (See *Sanchez*, *supra*, at pp. 911–912.) When a price term is alleged to be substantively unconscionable, we have explained that it is not sufficient for a court to consider only whether "the price exceeds cost or fair value." (*Perdue*, *supra*, 38 Cal.3d at p. 926; see also Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability Standard* (1994) 31 Hous. L.Rev. 721, 774–775 [urging the courts to examine components of a lender's costs including its "cost of obtaining the money lent" and expenses incurred "in making and administering the loan"].) The court must also "look to the basis and justification for the price." (*Perdue*, *supra*, 38 Cal.3d at p. 926.) (But see Korobkin, *Bounded Rationality, Standard Form Contracts, and Unconscionability* (2003) 70 U.Chi. L.Rev. 1203, 1206–1207, 1236 [arguing that "[w]hen a contract term is salient to purchasers, the market can be trusted to provide an efficient version of the term" and "price is probably salient to nearly all buyers"].) If, for example, the interest rate is high because the borrowers of the loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1164, 1162 (*Harris*) [discussing "the charging of higher rents as a means of subsidizing defaults" and stating that "[b]usiness establishments have an obvious and important interest in obtaining full

_____

individualized issues unsuited for class adjudication, we express no view on the merits of its argument as we were not called upon to review the district court's class certification order.

and timely payment for the goods and services they provide"].)  Finally, a court may consider whether there are market imperfections that make it less likely that the price was set by a "freely competitive market" and therefore more susceptible to unconscionability.  (*Perdue*, *supra*, 38 Cal.3d at p. 927.)

These factors underscore why finding unconscionable a contract setting an interest rate is categorically different from imposing an unvarying cap on the interest rate.  To declare an interest rate unconscionable means only that — under the circumstances of the case, taking into account the bargaining process and prevailing market conditions — a particular rate was "overly harsh," "unduly oppressive," or "so one-sided as to shock the conscience."  (E.g., *Sonic II*, *supra*, 57 Cal.4th at p. 1145; *Sanchez*, *supra*, at pp. 910–911.)  An unconscionability determination does not generally depend on a single factor, and tends to be "highly dependent on context."  (See *Sanchez*, *supra*, at pp. 911–912.)  This is a far cry from how a rate cap operates.  If an interest rate exceeds a cap, then it will always exceed the cap, as will all rates above it, regardless of the circumstances under which those rates came about.  A rate cap is uniform and rigid; unconscionability, on the other hand, is context-specific and malleable.  A reasonable Legislature can lift an interest rate cap without also intending that unconscionability will never apply to an uncapped rate.  Indeed, a reasonable Legislature can lift an interest rate cap, but — intending to protect consumers — specify that terms of consumer loans are still policed by the flexible standard of unconscionability.

## C.

CashCall concedes that consumer protection was a clear purpose of the legislation that enacted sections 22302 and 22303.  The company argues, however, that section 22302 shows only "the Legislature wanted to ensure that strong consumer protections remained in place as to aspects of loans *other* than interest

18

rates." To make this argument, CashCall relies on the legislative history of sections 22302 and 22303. Such reliance is misplaced: to the extent the legislative history is relevant here, it cuts against CashCall's position.

As introduced by Senator Rose Ann Vuich on May 1, 1985, Senate Bill 447 did not contain the protection now codified at section 22302. (Sen. Bill No. 447 (1985-1986 Reg. Sess.) May 1, 1985.) The Attorney General opposed the bill. In a letter addressed to Senator Vuich, the Attorney General expressed concern that the bill will leave "[c]onsumers who borrow amounts of less than $5,000" without adequate protection. (Atty. Gen. John K. Van De Kamp, letter to Sen. Vuich, June 28, 1985.) As the Attorney General explained, "these borrowers are least able to negotiate favorable finance charges" and "are precisely the persons who need protection against the exorbitant rates that could be charged if SB 447 is enacted." (*Ibid.*) Less than two weeks after receiving the letter, Senator Vuich introduced an amended version of Senate Bill 447, adding a statutory provision now codified in section 22302. (Sen. Amend. to Sen. Bill No. 447 (1985-1986 Reg. Sess.) July 10, 1985.)

This sequence of events fairly gives rise to the inference the legislation that became section 22302 was enacted to assuage the concern that the removal of interest rate caps would leave consumers without protection against exorbitant interest rates. By passing this legislation, the Legislature ensured that unconscionability would protect against such overreaching by lenders. (See Legis. Counsel's Dig., Sen. Bill. No. 447 (1985-1986 Reg. Sess.) as amended Apr. 23, 1985 [stating that the amendment "would make unconscionable loan contracts of personal property brokers and consumer finance lenders a violation of their respective licensure laws"].) It is true that the Department of Corporations (which was then engaged in "a friendly debate" with one of the industry supporters of Senate Bill 447) had expressed that it "will be neutral [to the proposed legislation]

19

if the <u>noninterest rate provisions</u> . . . <u>continue to apply to loans up to $5,000</u>."
(Sen. Com. on Banking and Commerce, Analysis of Sen. Bill No. 447 (1985-1986
Reg. Sess.) as amended Apr. 23, 1985, p. 2.)  That statement, however, was made
months before Senator Vuich amended the bill to add the protection now found in
section 22302.  As such, the statement sheds little light on the significance of
section 22302 or its scope.

To be sure, the statutory changes wrought by Senate Bill 447 had important
consequences for the loan market — consequences described in subsequent
analyses of the bill.  By removing interest rate caps on loans of at least $2,500, the
Legislature allowed the market to set the rates on those loans.  (See Dept. of
Corporations, Enrolled Bill Rep. on Sen. Bill No. 447 (1985-1986 Reg. Sess.)
prepared for Governor Deukmejian (Aug. 29, 1985) p. 1 ["The effect of this bill is
that interest rates for consumer finance loans above $2,500 will be set by the
market place."]; 6 Assem. J. (1993-1994 Session) p. 9016 ["It is the intent of the
Legislature to let the rates charged generally be set by free market competition
. . . ."].[6])  But the Legislature did not preclude the possibility that courts would
step in to protect consumers if interest rates — within the particular context of a

_____

[6]    As noted, the Assembly Journal cited relates to the 1993-1994 legislative
session, the session held about a decade after the passage of Senate Bill 447.
Normally, we do not think a statement of a later-sitting legislator sheds much light
on "the intent of an earlier Legislature's enactment."  (*Western Security Bank v.
Superior Court* (1997) 15 Cal.4th 232, 244 ["there is little logic and some
incongruity in the notion that one Legislature may speak authoritatively on the
intent of an earlier Legislature's enactment when a gulf of decades separates the
two bodies"]; see also, *Jones, supra,* 42 Cal.4th at p. 1171 ["The declaration of a
later Legislature is of little weight in determining the relevant intent of the
Legislature that enacted the law." (internal quotation marks omitted)]; *Bruesewitz
v. Wyeth LLC* (2011) 562 U.S. 223, 242 ["Post-enactment legislative history (a
contradiction in terms) is not a legitimate tool of statutory interpretation."].)  Here,
however, the 1994 Legislature repealed the original 1985 statutes and reenacted
them (verbatim) as sections 22002 and 22003.  As such, the statement may be
considered.

given transaction — are shown to be unconscionable. (See Dept. of Corporations, Enrolled Bill Rep. on Sen. Bill 447 (1985-1986 Reg. Sess.) p. 1 ["Senate Bill 447 removes only the rate regulation provision of the laws regulating lenders while preserving the consumer protection provisions of all laws."]; 6 Assem. J. (1993-1994 Session) p. 9016 ["The Legislature believes that the Law creates a reasonable balance between regulation and free-market activity, and provides necessary consumer protections."]; *Perdue*, *supra*, 38 Cal.3d at p. 943 ["The duty of good faith and fair dealing, and protection against unconscionable contracts, has never been thought incompatible with a free and competitive market. Defendant is really asking for a market free of those restraints against oppression and overreaching applicable to all other commercial operations."].)

At core, CashCall fails to persuade that removing an interest rate cap is the equivalent of making the interest rate immune from a finding of unconscionability. This is despite the company's attempt to spin this argument in different ways. For instance, CashCall casts the discussion as one in which sections 22302 and 22303 are irreconcilably inconsistent and section 22303 must prevail because it is the more specific provision. We do not agree. For a loan of at least $2,500, there is no overlap — and hence no inconsistency — between sections 22302 and 22303. As discussed above, section 22303 simply does not apply to such loans.[7]

In the alternative, CashCall seeks to characterize section 22303 as a "safe harbor" that protects lenders of larger-denominated loans from the reach of section 22302. In the context of a UCL claim alleging an unfair business practice, we have explained, "[i]f the Legislature has permitted certain conduct or considered a

---

[7] While it is possible that such an overlap may arise for loans *less* than $2,500, we have here no occasion to consider those loans. We thus express no view on whether an interest rate on such a loan may be unconscionable under section 22302 even if it complies with the interest rate cap of section 22303.

21

situation and concluded no action should lie," the "specific legislation" permitting that conduct provides a safe harbor that "plaintiffs may not use the general unfair competition law to assault." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 182.) Yet, even assuming that the concept applies to a UCL action premised on an unlawful, rather than unfair, business practice, the safe harbor rule does not "prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct." (*Id.* at pp. 182–183.) And not prohibiting the challenged conduct is all that section 22303 does.

That lack of proscription is not enough. (See *Cel-Tech*, *supra*, 20 Cal.4th at p. 183; see also, e.g., *Klein*, *supra*, 202 Cal.App.4th at p. 1379 [finding no safe harbor in an analogous situation].) "There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 183.) The absence of a rate cap on loans of at least $2,500 does not make all rates lawful, for all purposes, under all regulations. In particular, section 22303 does not insulate interest rates from the scrutiny authorized by section 22302. If section 22302 is a storm at sea, then section 22303 offers no safe harbor from it.

CashCall seeks to buttress its position by relying on the authority of the Department of Business Oversight (DBO), the administrative agency that oversees the enforcement of the Financing Law.[8] An agency interpretation of a statute's meaning and legal effect is entitled to the courts' consideration and respect (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7

---

[8] The DBO is the successor to the Department of Corporations. (DBO, History available at <http://www.dbo.ca.gov/About_DBO/DBO_history.asp> [as of Aug. 9, 2018].) All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

(*Yamaha*); *Larkin*, *supra*, 62 Cal.4th at p. 158.) Yet CashCall relies on the most tenuous evidence to bolster its argument about the DBO's purported interpretation of section 22302 or 22303. CashCall lifts an isolated sentence from a complaint the agency brought against it, which states that "a CFLL licensed lender can charge whatever interest rates it chooses on loans of bona fide principal amounts of $2,500 or more." (*In re Commissioner of the Business Oversight v. CashCall, Inc.* (Cal. Dept. of Bus. Oversight June 4, 2014) No. 603-8780, Accusation ¶ 2 (Accusation), available at <http://www.dbo.ca.gov/ENF/pdf/2014/CFL-CashCall_accusationrev_redacted.pdf> [as of August 9, 2018].) The complaint from which the sentence is taken did not concern either section 22302 or 22303 and, as one might expect of an accusation, contained no analysis of the cited statement.

We can hardly credit the preceding statement as the DBO's interpretation of the provisions at issue here. While we sometimes afford careful consideration and even a measure of deference to positions that are not taken through more formal policymaking mechanisms (see *Yamaha*, *supra*, 19 Cal.4th at pp. 10–11), the sentence CashCall pulls out of the agency's complaint is far from anything even resembling authoritative interpretation of the statutes. Not only does the complaint omit any analysis of either section 22302 or 22303, it does not even once cite those sections. Seldom if ever does an agency do anything that warrants the term "interpretation" when what it purportedly interprets does not even merit a passing reference. Nor did the agency quote the relevant statutory text, or explain how it understood the text to convey that CashCall can "charge any interest it choose[s]." (Accusation, ¶ 2.)

Even if we assume the statement reflects the DBO's interpretation of the statutes, we would not acquiesce to it. (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1265; *Larkin*, *supra*, 62 Cal.4th at p. 158.) There is no indication

that this statement — contained in a single complaint filed decades after the relevant provisions were enacted — received "careful consideration by senior agency officials," was " 'consistently maintained' " as an interpretation of the relevant statutes by the agency, or "was contemporaneous with legislative enactment of the statute being interpreted." (*Yamaha*, *supra*, 19 Cal.4th at p. 13.) The statement simply does not persuade.

### D.

Despite having urged an interpretation of sections 22302 and 22303 that ultimately fails, CashCall advances a beguiling argument for judicial abstention in the area of interest rate regulation. The district court adopted the argument, and — at least in certain circumstances different than those presented here — so have we.

One such case that came from our court is *Harris*, *supra*, 52 Cal.3d 1142. There, the plaintiffs brought a representative action, alleging that under the antidiscrimination rules of the Uhruh Act, their landlords could not require prospective tenants to have gross monthly incomes of at least three times the rent. (*Id.* at pp. 1149–1150.) The plaintiffs acknowledged that the landlords "have a legitimate interest in screening out tenants who are unable to pay rent regularly and on time throughout the tenancy." (*Id.* at p. 1166.) They maintained, however, that the minimum income policy constituted economic discrimination as proscribed by the Unruh Act. According to the plaintiffs, the Act "requires defendants to evaluate each prospective tenant's ability to pay rent utilizing relevant facts such as prior rental history," instead of relying on the "unsubstantiated assumptions that persons who meet the specified income standard will more likely pay rent than those who do not." (*Id.* at pp. 1166, 1150.)

We rejected the claim. After a careful examination of the language of the statute, our prior decisions, and the Legislature's reaction following some of those

decisions (*Harris*, *supra*, 52 Cal.3d at pp. 1154–1165), we concluded that the Uhruh Act, in "conspicuously omitting financial or economic" characteristics from its language, likely does not authorize an action for economic discrimination. (*Id.* at p. 1161.) Only after reaching this conclusion did we discuss — from a consequentialist point of view — why assessment of a person's creditworthiness should be "left to the guidance of market forces or to specific legislative and administrative action designed to address particular grievances." (*Id.* at p. 1167.) The courts, we said, " 'bring no special expertise' " to the task of " '[e]valuating landlord investment decisions made in a complex metropolitan housing market.' " (*Id.* at p. 1166.) Were they to adjudicate the plaintiffs' claim, judges would become involved "in a multitude of microeconomic decisions," with the battles waged over "economic studies and experts," and "the outcome [] of little value to the parties (because the various economic factors involved are subject to constant change) or to anyone else (because the fact-specific decision would not allow other landlords or tenants to predict what minimum income policy, if any, would pass muster)." (*Ibid.*) For these reasons, we held that "[i]n the absence of clear legislative direction, which the general antidiscrimination provisions of the Unruh Act do not provide, we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking." (*Id.* at p. 1168.)

*Harris* is distinguishable. In *Harris*, we were "unwilling to engage in complex economic regulation" absent "clear legislative direction." (*Harris*, *supra*, 52 Cal.3d at p. 1168.) Here, however, such "clear legislative direction" exists. By making an unconscionable loan a violation of the Financing Law and therefore actionable under UCL, the Legislature made clear that courts must grapple with such actions. (Contra *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 567 [finding judicial restraint proper because "no specific statutory provision prohibits respondents from stopping or curtailing sales of

25

homeowners insurance policies"]; *Korens v. R. W. Zukin Corp.* (1989) 212 Cal.App.3d 1054, 1063 [similar]; *Lazzareschi Inv. Co. v. San Francisco Fed. Sav. & Loan Ass'n* (1971) 22 Cal.App.3d 303, 311 ["the control of charges, if it be desirable, is better accomplished by statute," which was lacking in the case].)[9] To "abstain" in situations where the Legislature said we should act would be impermissible shirking. (See *Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237, 1259 [affirming the lower court's decision to overrule a demurrer because "the city attorney's suit does not call upon the court to determine complex economic policy. The Legislature has already made the relevant policy determinations by defining and outlawing postclaims underwriting"]; *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 499–500 [similar].) We will not do so.

Nor would our involvement supersede or interfere with the functions of the DBO. (Cf. *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1298 ["Judicial abstention is appropriate when granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency."].) As we have

---

**9** In *Peoples Finance & Thrift Co. of Beverly Hills v. Mike-Ron Corp.* (1965) 236 Cal.App.2d 897, 903, the court decided that it was without power to refuse enforcement of a contract even though it "believe[d] the total interest charged [was] unconscionable." The case was decided before the passage of Civil Code section 1670.5, and the court may have thought that it lacked the necessary power absent explicit statutory authorization. (But see *Perdue*, *supra*, 38 Cal.3d at p. 925 [noting that in enacting Civil Code section 1670.5, the Legislature "codified the established doctrine that a court can refuse to enforce an unconscionable provision in a contract"].) In any event, we believe *Peoples Finance* was "wrongly decided" (*Carboni*, *supra*, 2 Cal.App.4th at p. 81, fn. 5), not only for the reasons discussed in *Carboni* but also because the court conflated usury law and the unconscionability doctrine. (See *Peoples Finance*, *supra*, 236 Cal.App.2d at 900–903.) We therefore disapprove of the case to the extent that it is inconsistent with this opinion.

explained, the finding that a particular interest rate is unconscionable does not mean that the rate is capped at that level for all purposes. Similarly, a finding that a rate is *not* unconscionable does not bar another party — or the DBO — from challenging that same rate, arrived at in a different bargaining process or amidst different market conditions.

Nothing we say today limits the agency's operation. In fact, if CashCall were correct, then the DBO has been operating under the erroneous impression that a lender like CashCall "can charge whatever interest rates it chooses on loans of bona fide principal amounts of $2,500 or more." (Accusation, *supra*, ¶ 2.) By holding to the contrary, we empower the agency — and the courts — to take action when the interest rates charged prove unreasonably and unexpectedly harsh. In so doing, we recognize the expertise of the DBO, but also that of the courts. (Cf. *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 63 ["It is not simply that a single superior court judge hearing a single UCL case is a poor choice to resolve a myriad of complicated fact and policy issues tied to the economics, risks, cost and availability of title insurance. It is that given the scope of its administrative authority and depth of regulatory experience, the Department of Insurance is likely to prove better at the job."].) Since guarding against unconscionable contracts has long been within the province of the courts (see Civ. Code § 1670.5; *Bridge*, *supra*, 163 Cal. at p. 498 ["where it is a loan and the interest is exorbitant, or the terms unconscionable, *the courts* will compel each party to do equity" (italics added)]), judges, no less than commissioners, speak with "authority and depth of [] experience" when considering an unconscionability claim. (*Quelimane*, *supra*, 19 Cal.4th at p. 63.)

Despite the courts' breadth and depth of experience, the trial judge here thought it impossible to fashion a remedy under the UCL "without deciding the point at which CashCall's interest rates crossed the line into unconscionability."

27

(*CashCall*, *supra*, 56 F.Supp.3d at p. 1109.) We offer only brief thoughts on this matter, as the question of class-wide relief under the UCL is beyond the issue we are asked to consider by the Ninth Circuit. We acknowledge that *some* remedies may conceivably operate in a manner that approximates an across-the-board imposition of a cap on interest rates. (See, e.g., *California Grocers*, *supra*, 22 Cal.App.4th at p. 217 [holding that an injunction requiring defendant bank to charge all customers no more than a specified dollar amount for its service for 10 years was "an inappropriate exercise of judicial authority"].) We express no view on the suitability of such remedies. We simply note that remedies routinely have economic consequences, and we do not think courts are devoid of power to issue properly-fashioned remedies to mitigate unconscionability — which trial courts possess wide equitable powers to craft. Certain relief — for example, ordering CashCall to change its advertising practices; imposing a "cool down" period before CashCall may dispense the loans; or refusing to enforce the contract's terms so that CashCall is limited to the amount of interest it has recouped from the borrowers and no more — should raise no issue of rate-cap setting. Along the same line, a court may also order restitution, so long as it tailors and justifies its ruling based on the specific context of the case, taking into account such considerations as the borrowers' circumstances, the lenders' specific risks, and other terms in the contract (e.g., prepayment penalties, origination fees, or loan rollovers) that, in conjunction with the interest rate, may render the contract unduly oppressive. (See, e.g., *Sanchez*, *supra*, 61 Cal.4th at p. 912 [noting that a court deciding an unconscionability case must view "all relevant circumstances"].)

In short, California courts have the authority to decide whether contract provisions, including interest rates, are unconscionable. Our respect for the Legislature's prerogative to shape economic policy through legislation is why we

28

have kept the doctrine relatively narrow, and are careful to observe its nuances. But this is no reason for courts to absent themselves from the picture entirely.

Even were we to adopt a policy-oriented, consequentialist perspective, we are not convinced that a parade of horribles is likely to result from the courts' inquiry into whether a consumer loan is unconscionable owing to the interest rate charged. CashCall argues to the contrary, contending that such scrutiny would undermine the purposes of the Financing Law. This is because "[t]he uncertainty and unpredictability imposed by ad hoc decisions of 'unconscionability' . . . would drive lenders out of the market," and so both deprive "consumers of credit options" and hamper competition among lenders.

CashCall is correct that the Financing Law is intended to foster competition and ensure an adequate supply of credit. But the law is also meant to protect consumers. (See Fin. Code, § 22001, subd. (a).) What's more, whatever are the relative advantages or disadvantages of relying on unconscionability to afford such protection, that is the choice the Legislature has made. Ultimately, CashCall has not said anything that is not true of "ad hoc decisions of 'unconscionability' " generally. Unconscionability, as an ex post, case-specific mechanism by which a court "may refuse to enforce the contract . . . [or] limit the application of any unconscionable clause as to avoid any unconscionable result" (Civ. Code, § 1670.5) by necessity introduces uncertainty into commercial transactions. But neither that uncertainty nor the fact that "[c]ommerce depends on the enforceability, in most instances, of a duly executed written contract" has persuaded the Legislature to decree that all duly executed written contracts shall be enforced at all times. (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245.) To the contrary, the Legislature has enacted into statute the unconscionability doctrine, making it a limitation to the enforcement of contracts in California. (Civ. Code, § 1670.5.) CashCall cannot seriously suggest that we

29

have the authority to question the Legislature's policy choices or contravene its directive. (*Max Factor & Co. v. Kunsman* (1936) 5 Cal.2d 446, 455–456 ["it is no part of the duty of this court to determine whether the policy embodied in the statute is wise or unwise"].)

What concerns about freedom of contract, the importance of commerce, and continued access to credit have done is produce an understanding of unconscionability that is inherently nuanced, such that few courts have ever declared contracts unconscionable. This is all the more true in the context where the unconscionable term alleged is the interest rate on a loan. In 1991, the First District Court of Appeal was surprised to learn there has been no case "which applies the doctrine of unconscionability to specifically annul or reform a loan which bears a shockingly high rate of interest." (*Carboni*, *supra*, 2 Cal.App.4th at p. 81.) That court then became the first since the passage of Civil Code section 1670.5 to find that the interest rate was unconscionable. (*Id.* at p. 83.) To the best of our knowledge, it remains the only California court to have done so. (*De La Torre v. CashCall, Inc.*, *supra*, 56 F. Supp.3d at p. 1108 ["Only one California court has ever found a challenged interest rate unconscionable," *Carboni*]; see also Martin, *Public Opinion and the Limits of State Law: The Case for a Federal Usury Cap* (2014) 34 N.Ill.U. L.Rev. 259, 288 ["cases in which unconscionability has been applied to consumer loans are few and far between"]; Task Force of the A.B.A. Subcommittee on General Provisions, Sales, Bulk Transfers, and Documents of Title, Committee on the Uniform Commercial Code, *An Appraisal of the March 1, 1990, Preliminary Report of the Uniform Commercial Code Article 2 Study Group* (1991) 16 Del. J. Corp. L. 981, 993 ["Despite early criticism of § 2-302, the courts have exercised restraint in identifying what has been called 'procedural' unconscionability in both consumer and commercial transactions."].) In light of such a cautious tread by the courts, the idea that

30

"[j]udicial regulation would supplant market conditions in setting rates" and thereby drive out lenders appears lacking in empirical support.

What's more, to the extent CashCall means to raise concerns about a possible flood of unmeritorious lawsuits, certain features of the UCL are likely to mitigate any such flood. The unfair competition law, while broad in scope, is limited in remedies. (E.g., *Cel-Tech*, *supra*, 20 Cal.4th at p. 179; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1152; *Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 452.) Private individuals like plaintiffs may win restitution or injunctive relief, but they cannot obtain damages or attorney fees. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 179.) The relative paucity of remedies under the UCL should serve to limit pure attorney-driven lawsuits (since no attorney fees may be recovered) as well as blackmail settlements (since no money recovery beyond restitution is possible).

Finally, CashCall focuses much of its briefing on defending its business methods and practices. The Ninth Circuit did not ask us to decide whether CashCall's loans were unconscionable, and we do not resolve that question. We hold only that California law permits such a finding, as long as the requirements of unconscionability are satisfied.

## III.

With roots predating the Anglo-American legal tradition, the doctrine of unconscionability has been used to temper the consequences of certain bargains arising in the course of economic life.  The California Legislature is entitled to subject loan transactions, like other contracts, to the unconscionability doctrine's nuanced blend of tractability and protection of human dignity.  It did so here.

In doing so, the Legislature chose to retain the flexible standard of unconscionability even as it did away with interest caps on consumer loans of $2,500 or more.  By its action, the Legislature recognized to some degree how commerce depends on fairness, and functioning markets on meaningful choices.  Although courts must proceed with caution in this area, the possibility that an interest rate is unconscionable in a particular context is not so different relative to any other kind of potential contractual defect that it justifies concluding that courts lack power or responsibility to address unconscionable interest rates.  In light of the Legislature's choice, as reflected in the text, context, and history of the relevant statutory provisions and the unconscionability doctrine, we conclude the interest rate on consumer loans of $2,500 or more may render the loans unconscionable under section 22302 of the Financial Code.

                                                                          **CUÉLLAR, J.**

**WE CONCUR:**
**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**HALLER, J.***

---

\*        Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** De La Torre v. CashCall, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S241434
**Date Filed:** August 13, 2018

_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

The Strudevant Law Firm, James C. Sturdevant; Rukin Hyland Doria & Tindall, Gibbs Law Group, Steven M. Tindall, Andre M. Mura; Rukin Hyland, Rukin Hyland & Riggin, Jessica Riggin; Law Offices of Damon M. Connolly, Damon M. Connolly; Law Office of Arthur D. Levy and Arthur D. Levy for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen and Michael Reynolds, Deputy Attorneys General, for Attorney General of the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Caryn Becker; Seth E. Mermin, Brady C. Williams; Williams Cuker Berezofsky, Berezofsky Law Group, Michael J. Quirk; Ellen Harnick; and Scott L. Nelson for Center for Responsible Lending, National Association of Consumer Advocates, Public Citizen, Inc., and Public Good Law Center as Amici Curiae on behalf of Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Brad W. Seiling, Donald R. Brown and Joanna S. McCallum for Defendant and Respondent.

Morrison & Foerster, James R. McGuire and Nancy R. Thomas for California Financial Service Providers Association, Financial Service Centers of America, Community Financial Services Association of America and Online Lenders Alliance as Amici Curiae on behalf of Defendant and Respondent.

Fred J. Hiestand; Ericka C. Frank and Heather L. Wallace for the Civil Justice Association of California and the California Chamber of Commerce as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

James C. Sturdevant
The Strudevant Law Firm
4040 Civic Center Drive, Suite 200
San Rafael, CA 94903
(415) 477-2410

Brad W. Seiling
Manatt, Phelps & Phillips
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
(310) 312-4000