Filed 2/27/26  De La Torre v. CashCall CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EDUARDO DE LA TORRE et al.,<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>CASHCALL, INC.,<br><br>      Defendant and Appellant. | A169205<br><br>(San Mateo County<br>Super. Ct. No. 19-CIV-01235) |

      This is a class action for violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200).  Plaintiff Eduardo De La Torre, on behalf of a class of individuals who took out subprime loans from defendant CashCall, Inc. (CashCall), alleges the company's interest rates of 96 percent to 135 percent violate Financial Code[1] section 22302, which applies Civil Code section 1670.5—the codification of the unconscionability doctrine—to consumer loans.  After a 14-day bench trial, the trial court found the interest rates were unconscionable and ordered restitution to the class of all payments they made to CashCall above the principal amounts of their loans

---

[1]      Further unspecified statutory references are to the Financial Code.

and a $75 origination fee.  The court further enjoined any efforts by CashCall or third parties to collect on the class loans.

On appeal, CashCall contends the finding of unconscionability was erroneous because the trial court relied on improper factors and evidence and failed to conduct a sufficiently contextualized inquiry as required by law.  In challenging the court's remedies, CashCall argues (1) the restitution award is contrary to law because it provides no offset for the value of the loans, and (2) the injunction is not authorized because there was no evidence of a continuing threat of misconduct.  Finally, CashCall contends its posttrial motion to decertify the class should have been granted because the evidence at trial demonstrated that individualized issues predominated amongst the class, and that the restitution award created an irreconcilable conflict between class members.  We will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

At all relevant times, CashCall provided unsecured, high-interest consumer loans to borrowers with poor credit histories.  CashCall used what it called a "rental car model" for these loans, allowing borrowers to "rent the cash" for "as long as they needed it and pay it back at any given time" with no penalty for "prepayment."[2]  In its advertisements, telephone calls, and promissory notes, CashCall explicitly advised consumers to prepay the loans as soon as possible.

CashCall initially offered loans of $10,000 at 24 to 39 percent interest, and $5,000 at 47 to 59 percent interest.  In late 2004, CashCall began to offer its $2,600 loan.  This principal amount was chosen because California law imposes interest rate caps on loans under $2,500.  (See § 22303; *De La Torre*

---

[2]     By "prepayment," we mean repayment of all or a portion of the loan before its maturity date.

2

*v. CashCall, Inc.* (2018) 5 Cal.5th 966, 973 (*De La Torre*).) After deducting a $75 origination fee, CashCall extended the $2,525 sum to qualifying borrowers.

CashCall advertised its $2,600 loan as providing quick cash with a high interest rate, but with no collateral requirement or prepayment penalty. The advertising directed the public to call or visit CashCall's website, and a CashCall loan officer was available to help callers with the loan application, which could be submitted online or over the telephone.

CashCall initially set the interest rate on its $2,600 loan at 79 percent, with a maximum loan term of 42 months. CashCall eventually raised the rate several times, first to 87 percent, then to 96 percent in 2005, and to 135 percent in 2009.

CashCall began to offer mortgages in 2008 but eventually sold the mortgage business in 2015. By the time of the trial in this case in 2021, CashCall was "in a wind down portfolio" and was "not originating any new loans."

### A. The Federal Lawsuit and *De La Torre*

Plaintiff initially filed suit against CashCall in the federal district court for the Northern District of California, alleging claims under state and federal law. After certifying classes on the state UCL claim and one of the federal causes of action, the district court granted CashCall's motion for summary judgment on the UCL claim. In concluding the claim was not viable as a matter of law, the court reasoned that a ruling in plaintiff's favor would intrude upon the Legislature's province of regulating interest rates and thereby violate the doctrine of separation of powers. (*De La Torre v. CashCall, Inc.* (N.D.Cal. 2014) 56 F.Supp.3d 1105, 1009–1110.)

3

Plaintiff appealed, and the United States Court of Appeals for the Ninth Circuit certified to the California Supreme Court the question whether the interest rate on a consumer loan of $2,500 or more can render the loan unconscionable under section 22302. (*De La Torre, supra,* 5 Cal.5th at p. 973.) Pointing out that section 22303 sets maximum interest rate caps only on consumer loans less than $2,500, CashCall had argued the statute's inapplicability to any loan of a bona fide principal amount higher than $2,500 implies that a court may never declare unconscionable an interest rate on a loan of $2,500 or more. (*De La Torre,* at p. 973.) The Supreme Court disagreed: "[J]ust because loans of at least $2,500 are not subject to a numerical ceiling on the interest rate does not mean they cannot be found unconscionable. The Legislature made this clear when it enacted section 22302—which applies the unconscionability doctrine to all consumer loans— at the same time that it lifted interest caps on loans exceeding $2,500." (*De La Torre,* at pp. 976–977.)

The Supreme Court rejected CashCall's position as resting "on an assumed—but false—equivalence between interest rate caps and unconscionability." (*De La Torre, supra,* 5 Cal.5th at p. 981.) Instead, the high court held, unconscionability "is a flexible doctrine" that "requires more than just looking at one particular term in a contract, comparing it to a fixed benchmark, and declaring the term unconscionable." (*Id.* at p. 982.) Noting the procedural and substantive elements of the doctrine, the court emphasized the "need to consider context," as well as " 'the basis and justification for the price.' [Citations.] If, for example, the interest rate is high because the borrowers of the loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability." (*Id.* at p. 983.) But courts may also "consider

4

whether there are market imperfections that make it less likely that the price was set by a 'freely competitive market' and therefore more susceptible to unconscionability." (*Id*. at p. 984.) As *De La Torre* explained, "[t]hese factors underscore why finding unconscionable a contract setting an interest rate is categorically different from imposing an unvarying cap on the interest rate. . . . A reasonable Legislature can lift an interest rate cap without also intending that unconscionability will never apply to an uncapped rate. Indeed, a reasonable Legislature can lift an interest rate cap, but—intending to protect consumers—specify that terms of consumer loans are still policed by the flexible standard of unconscionability." (*Ibid*.)

On remand, the only remaining claim in the federal district court was plaintiff's unconscionability cause of action under the UCL. Accordingly, the court dismissed the action without prejudice for lack of subject matter jurisdiction. (*De La Torre v. CashCall, Inc.* (N.D.Cal. Feb. 5, 2019) 2019 U.S. Dist. Lexis 18624.)

### B. The Instant Class Action

Plaintiff then filed the instant action in California state court, alleging a single cause of action under the UCL for unlawful business acts or practices based on section 22302 and Civil Code section 1670.5. Plaintiff alleged CashCall's $2,600 loans made between August 1, 2005 and July 10, 2011, which bore interest at 96 to 135 percent for terms of 36 to 47 months, were unconscionable. The complaint sought restitution "of all interest paid" under the challenged loans, as well as "[a]n injunction permanently enjoining [CashCall] from collecting or assigning for collection any interest" on the challenged loans.

In January 2020, the trial court certified a class of "[a]ll individuals who, while residing in California, borrowed from $2,500 to $2,600 from

5

CashCall, Inc., for personal, family or household use at any time from August 1, 2005 to July 10, 2011." Under this class definition, there were 133,848 loans made to 119,844 class members. Of the class members, 31,604 (26.4 percent of the class) were repeat borrowers. Three class members each took out 30 loans, and 12,484 class members each took out three or more loans.

Approximately 46 percent of the class loans went into default. Of those defaults, 5,737 (4.29 percent) involved loans where borrowers made no payments towards the principal amount owing, while 2,760 (2.06 percent) involved loans for which no payments were made whatsoever. There was also, however, a significant number of prepayments. Although the maximum loan terms for the class were between 36 and 47 months, only 10 percent of the 133,848 class loans were paid over the full term, while 43.8 percent of the class loans were paid off prior to the end of the term. Approximately four percent of the class loans were fully repaid within the first month; 17.29 percent were repaid within six months; and about 35 percent were repaid within one year.

### C. Trial and Decision

A 14-day bench trial was held over several months in 2021. The trial court heard testimony from plaintiff and class members Arthur Vardanyan, Yosvin De Leon, and Lori Hume. Plaintiff further presented the testimony of CashCall's chief financial officer, Delbert Meeks, predatory lending practices expert Margot Saunders, consumer finance market expert Adam Levitin, neuropsychology expert Dr. Stacey Wood, and accounting expert Bruce McFarlane. The court also heard testimony from CashCall's advertising expert, John Fuller, former CashCall loan agent and production manager Brendan McCarthy, former CashCall underwriter Thomas Morgan, and

6

CashCall's market experts Christopher James, Gordon Klein, and Bruce Carlin.

Both sides requested a statement of decision. In January 2022, the trial court issued a written tentative decision concluding plaintiff and the class had proved the class loans were unconscionable and thus violative of the UCL. In November 2022, the court issued its proposed statement of decision awarding restitution of all interest the class members had paid to CashCall on their loans, minus the $75 origination fee and the principal amounts still owing on the loans. In total, the court tentatively awarded the class $235,476,789 in restitution.

CashCall filed a motion for decertification, which the trial court denied.

Both parties filed written objections to the proposed statement of decision. The trial court issued a final statement of decision and judgment in August 2023. The court corrected a double-counting error in which the $75 origination fee was subtracted twice from the total amount of interest paid by the class; accordingly, $10,038,600 was added to the restitution award, for a total of $245,515,389. The court additionally ordered "rescission" of the unconscionable loan agreements.

CashCall moved to vacate the judgment and for a new trial, arguing that rescission is not an available remedy under the UCL, and that the trial court erred by failing to account for the value the loans had provided to plaintiff and the class. The court denied CashCall's posttrial motions but issued an amended judgment and "Amended Final Statement of Decision."

In brief, the trial court found the class loans were adhesion contracts, which established "an initial showing of procedural unconscionability." The court also found elements of oppression and surprise in CashCall's advertising and in the loan application process. On the element of

7

substantive unconscionability, the court determined the loan terms "yielded harsh results" that were not justified by CashCall's costs of business or the risk of default in lending to credit-impaired borrowers. In the court's words, its award reflected "the return (restitution) of all interest paid by those Class members who have paid to [CashCall] more than the amount of their principal on their 101,564 loans, and minus the $75 origination fee charged by [CashCall] (which is not illegal)." The court awarded no restitution "on the 32,284 loans to those Class members who have paid to [CashCall] less than the amount of the principal of the loans." The court further enjoined CashCall "and any and all of its parents, subsidiaries, assignees, transferees, loan portfolio purchasers, representatives, agents, officers, directors, employees, and/or trustees" from collecting interest on the class loans.

This appeal followed.

## DISCUSSION

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo, and we review the trial court's findings of fact for substantial evidence. 'Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' " (*Durante v. County of Santa Clara* (2018) 29 Cal.App.5th 839, 842.)

"It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. [Citation.] 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench

8

trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)[3]

## A. Unconscionability

The unconscionability doctrine has both procedural and substantive elements, "the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1133.) Both must be shown for unconscionability to be established, but not necessarily in the same degree. (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125 (*OTO*).) We evaluate unconscionability on a sliding scale; the more substantively one-sided the contract term, the less evidence of procedural unconscionability is required to conclude that the term is unenforceable, and vice versa. (*Id.* at pp. 125–126.) "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 912 (*Sanchez*).) When unconscionability is shown, the trial court has discretion either to refuse to enforce the contract or to strike the

---

[3]     Here we note (and reject) CashCall's argument that the doctrine of implied findings "cannot save the judgment" because the trial court's statement of decision went through four versions and therefore " 'clearly demonstrates what the court did.' " The mere fact that the statement of decision underwent multiple revisions does not disable the implied findings doctrine in any material respect, as none of CashCall's arguments hinges on a principal controverted issue that the court failed to expressly address after the omission was brought to its attention. (See *Thompson*, *supra*, 6 Cal.App.5th at pp. 981–983 [discussing two-step procedure of Code of Civil Procedure sections 632 and 634 for disabling doctrine of implied findings on appeal].)

unconscionable provision and enforce the remainder of the contract.  (Civ. Code, § 1670.5, subd. (a).)

"Although unconscionability is ultimately a question of law, numerous factual inquiries bear upon that question.  'To the extent there are conflicts in the evidence or in the factual inferences which may be drawn therefrom, we must assume a set of facts consistent with the court's finding of unconscionability if such an assumption is supported by substantial evidence.' " (*Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 83.)

### *1. Procedural Unconscionability*

For the element of procedural unconscionability, "[t]he pertinent question . . . is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required.  [Citations]  ' " 'Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' [Citations.] . . . .  [¶] 'The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney.' " (*OTO, supra*, 8 Cal.5th at pp. 126–127, italics omitted.)  "The ' "oppression" factor of the procedural element of unconscionability may be defeated, if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be

10

unconscionable.' " (*Fisher v. MoneyGram International, Inc.* (2021) 66 Cal.App.5th 1084, 1095–1096 (*Fisher*).)

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' [Citation.] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO*, *supra*, 8 Cal.5th at p. 126.) That a contract is one of adhesion does not by itself render it unenforceable as unconscionable. (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 179.) An adhesive contract does, however, establish at least some degree of procedural unconscionability and requires courts to " 'scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided.' " (*Sanchez*, *supra*, 61 Cal.4th at p. 915; *Fisher*, *supra*, 66 Cal.App.5th at p. 1095.)

Here, the trial court found, and substantial evidence supports, that CashCall's loan contracts were adhesive. There was unequal bargaining power between the parties, as CashCall intentionally targeted credit-impaired borrowers desperate for funds and therefore vulnerable to sharp lending practices. The loans were offered "on a take-it-or-leave-it basis" to the class members, who had "*zero* bargaining power," and it was CashCall who dictated the amount of the loan, the interest rate, the loan term, the minimum monthly payment amount, and the terms of the written contract, all in an accelerated application process. Notably, when a consumer sought to borrow less than $2,600, CashCall refused and advised them to simply pay back some of the $2,600 upon funding, a practice that allowed CashCall to evade statutory interest rate caps on loans less than $2,500.

The trial court also determined the loan transactions involved elements of oppression and surprise. Specifically, the court found the class members

generally were not financially sophisticated and lacked access to comparable alternative loans, as pay day loans, auto title loans, secured credit cards, pawn broker loans, and tax anticipation loans were not comparable loan products. On the issue of surprise, the court acknowledged that the unconscionable terms were expressly stated in the loan agreements and that some class members quickly paid off their loans and then applied for and received another loan. The court nevertheless found some degree of surprise in that CashCall's television advertisements did not mention the length/term of the loan, the total amount of interest payments, the annual percentage rate of the interest to be charged, and the actual interest rate. Furthermore, the advertisements' "emphasis on the speed of the process" (e.g., " 'Call today; cash tomorrow' ") induced borrowers to quickly proceed with the loan, even at the high interest rates.

CashCall criticizes the trial court's procedural unconscionability analysis for its reliance on broad generalizations about subprime borrowers untethered to specific evidence about the class members. As CashCall notes, the trial court relied heavily on expert testimony regarding American consumers' lack of financial sophistication and understanding of how interest rates work. CashCall also highlights that nearly 44 percent of the class loans were prepaid, which in CashCall's view "reflects sufficient borrower sophistication to understand both the benefits and burdens of the loans." We are not persuaded. These arguments are based on inferences that CashCall draws from the evidence in its favor, which is insufficient to show error on substantial evidence review. (*Alper v. Rotella* (2021) 63 Cal.App.5th 1142, 1148 (*Alper*).)

CashCall nevertheless insists "the statement of decision shows beyond reasonable debate that the trial court did not consider [the prepayment]

evidence *at all*, relying instead entirely upon experts' generalizations." We squarely disagree. The amended final statement of decision explicitly acknowledges the rate of prepayment among the class, including that four percent of the class loans were fully prepaid within one month; 17.29 percent were prepaid within six months; and 43.8 percent of the class loans were paid off prior to the end of the loan terms. We assume the court considered the effect of this evidence and concluded the mere fact that 43.8 percent of the class prepaid the loan within a year does not necessarily reflect the borrowers' financial sophistication and understanding at the time they entered into the loan agreements, the relevant time frame for assessing unconscionability. (*Sanchez*, *supra*, 61 Cal.4th at p. 920.) It could be that a full realization of the onerousness of the loan terms, including (in the court's words) the "tiny amortiz[ation] of principal," only became apparent as the class members attempted to pay down the loans over time.

Nor does CashCall persuasively demonstrate the trial court's error in relying on the testimony of plaintiff's experts. CashCall does not argue that the testimony did not meet the standards for admissibility of expert opinions (*People v. McDowell* (2012) 54 Cal.4th 395, 425–426), or that the opinions were too speculative or were based on matters upon which the experts could not permissibly rely (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–773; Evid. Code, §§ 801, subd. (b), 802). Rather, CashCall argues the trial court's reliance on expert testimony was improper because it contravened the Supreme Court's instruction that the evaluation of unconscionability is "highly dependent on context." (*Sanchez*, *supra*, 61 Cal.4th at p. 911.) But CashCall assumes, without support, that an expert cannot provide the necessary context for this inquiry. What the law requires is an "inquiry into the 'commercial setting, purpose,

13

and effect' of the contract or contract provision," as distinguished from a mere perfunctory examination of whether the price exceeds cost or fair value. (*Sanchez*, at pp. 911–912, citing *Williams v. Walker-Thomas Furniture Co.* (D.C. Cir. 1965) 121 U.S. App.D.C. 315, 450 [unconscionability must "be considered 'in the light of the general commercial background and the commercial needs of the particular trade or case' "]; see *De La Torre*, *supra*, 5 Cal.5th at p. 983 [insufficient for court "to consider only whether 'the price exceeds cost or fair value' "].) We have no trouble concluding the testimony of plaintiff's expert witnesses on subprime borrowers and sharp lending practices provided important context on the commercial setting, purpose, and effect of the loans in question that assisted the trial court in scrutinizing the loan transactions.

Indeed, CashCall's own expert, Carlin, provided similar testimony that subprime borrowers generally have low financial literacy, and he agreed that subprime borrowers typically do not understand terms like annual percentage rates and amortization. Carlin further testified that when consumers ultimately become aware of how amortization works, the small amount of each loan payment that goes toward principal (and not interest) is "shocking to most people." All of this expert testimony was relevant and appropriate to a sufficiently contextual analysis in line with *Sanchez* and *De La Torre*.

CashCall nevertheless maintains the experts' generalizations could not be relied upon because they were "contradicted" by more specific testimony of certain class members. CashCall highlights three examples: De Leon's testimony that during the initial telephone call with a loan agent, De Leon calculated the total cost of the loan if taken to term at 135 percent interest and said "Whoa"; Hume's similar testimony that she said "Whoa" when

14

informed of the 135 percent interest rate; and Vardanyan's testimony that he took out five CashCall loans and paid them off early. But CashCall omits reference to Hume's and De Leon's testimony that they did not understand loan amortization and were upset by how little of their payments went towards paying down the principal amount of the loans. Such selective citation to the record fails to demonstrate the trial court erred in relying on the expert testimony, and we decline CashCall's invitation to draw inferences from the class members' testimony contrary to those drawn by the trial court. (See *Alper*, *supra*, 63 Cal.App.5th at p. 1148.) On this record, we may assume the trial court weighed all the expert and nonexpert testimony in concluding that although some class members may have had a general understanding of the impact of high interest rates, the transactions were marked by elements of oppression because the class on balance lacked sufficient financial sophistication and understanding of the full impact of the loans terms and because of the unequal bargaining power of the parties.

CashCall next contends the trial court erroneously rejected evidence about available alternative loans (e.g., auto loans, payday loans), arguing the available alternatives in the market need not be an identical product in order to demonstrate the consumers had a meaningful choice. CashCall again fails to demonstrate error. The determination whether alternative loans were sufficiently comparable to CashCall's $2,600 loan was ultimately a question of fact. We do not reweigh the evidence or substitute our judgment on such matters, and we merely ask whether substantial evidence supports the trial court's resolution of this factual question. (*Thompson*, *supra*, 6 Cal.App.5th at p. 981.) It does. Experts Saunders and Levitin testified that payday loans, auto title loans, secured credit cards, pawn broker loans, and tax anticipation loans "differed in regard to amount, length of term, secured or unsecured,

15

fees, underwriting requirements" and were not true alternatives to CashCall's $2,600 loan. CashCall CFO Meeks likewise testified that the $2,600 loan was "unique" and "was not being offered" by other lenders at the time.

CashCall contends the trial court's finding that the loans were made on a "take-it-or-leave-it" basis ignores context, as it is common for consumer loans to be nonnegotiable. But even accepting that premise, the adhesiveness alone was sufficient to establish some degree of procedural unconscionability. (*Sanchez, supra*, 61 Cal.4th at p. 915; *Fisher, supra*, 66 Cal.App.5th at p. 1095; *Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 822–823.) More to the point, when combined with the court's findings of oppression and surprise, the evidence raised the level of procedural unconscionability beyond the mere adhesiveness of the loan contract.

CashCall suggests the lack of a prepayment penalty effectively leveled the playing field because it allowed the borrowers to avoid the nonnegotiable terms. Again, CashCall seeks to draw inferences from the evidence in its favor rather than demonstrate the trial court erred in drawing a contrary conclusion. And as will be discussed, *post*, despite the ability to prepay, the borrowers were still bound by the exorbitant interest rates. It was not unreasonable for the court to conclude the ability to prepay the loan was not a proxy for the ability to negotiate against unduly harsh terms, particularly for borrowers already in dire financial straits.

For these reasons, we conclude CashCall fails to demonstrate error in the trial court's finding of procedural unconscionability.

### 2. Substantive Unconscionability

"Substantive unconscionability examines the fairness of a contract's terms. This analysis 'ensures that contracts, particularly contracts of

16

adhesion, do not impose terms that have been variously described as
" ' 'overly harsh" ' [citation], " 'unduly oppressive' " [citation], " 'so one-sided as
to "shock the conscience" ' " [citation], or "unfairly one-sided" [citation].  All of
these formulations point to the central idea that the unconscionability
doctrine is concerned not with "a simple old-fashioned bad bargain" [citation],
but with terms that are "unreasonably favorable to the more powerful
party." '  [Citation.]  Unconscionable terms ' "impair the integrity of the
bargaining process or otherwise contravene the public interest or public
policy" ' or attempt to impermissibly alter fundamental legal duties.
[Citation.]  They may include fine-print terms, unreasonably or unexpectedly
harsh terms regarding price or other central aspects of the transaction, and
terms that undermine the nondrafting party's reasonable expectations."
(*OTO*, *supra*, 8 Cal.5th at pp. 129–130.)

Here, the trial court found the loan terms "yielded harsh results," as
they "were specifically designed to require the borrower to pay exorbitant
amounts of interest with tiny amortizement of principal with the monthly
payments over the first two-plus years."  As the court noted, the total amount
of payments on a $2,600 loan at 96 percent for a term of 42 months was
$9,184.17, $6,659.17 of which was interest, while the total amount of
payments for a loan at 135 percent interest for a term of 36 months was
$10,761.78, of which $8,236.78 was interest.  The court found additional
harshness in the borrowers' inability to borrow less than $2,600.  In the
court's view, "[b]y requiring borrowers to borrow more than they wanted, and
simply telling them to just prepay back what principal they didn't need/want,
this yielded interest rate profits to CashCall that were unjustified."

The trial court also found that the length of the loans was unfair and
harmful to the class, and that CashCall set the loan durations for its own

economic benefit. Based on the expert testimony, the court rejected the notion that the lack of a prepayment penalty was for the benefit of the class and found it was a means for CashCall to pressure prospective borrowers to accept the $2,600 loan at the high interest rates.

In the trial court's view, CashCall's business model was not like that of a conventional lender to recover the money lent, but to achieve an excessive profit using exorbitant interest rates, even while knowing many borrowers would default. As the court explained, "[t]he business model for [CashCall] was to achieve a profit before the loan went into default, and that at the time of making the loan, [CashCall] already factored in that it expected 40% of these loans to go into default. Thus the subprime borrowers were set up to fail—as long as they 'failed' after 20 months of making payments. Even if the loan goes into default, CashCall then gets *additional* money by selling those charged-off loans to others."

The trial court rejected CashCall's claim that the high interest rates were justified by the company's costs of business. Specifically, the court found that CashCall did not price its loan based upon the costs of making the loans, but on "an artificial profit goal" that "had no demonstrated correlation to the profit margin of other subprime lenders or allege[d] 'alternative' lenders. CashCall presented no such profitability evidence as to competitors in the market. The 'price' of the CashCall loan was not based upon a freely competitive market." As the court explained, the lack of direct competitors allowed CashCall to set interest rates based on its profitability targets, which it "*never* modified . . . over the years, despite changes in the market and the economy." The court emphasized that even the change in rates from 96 to 135 percent was not based upon market conditions. Though acknowledging CashCall had potential competition in the later years of the class period, the

18

court found "they were all minor players in this subprime market and had no price pressure on CashCall even though they offered lower rates."

The trial court also rejected CashCall's evidence that it made only a modest "profit of 7% to 8% on its $2600 loans" because CashCall "presented not [*sic*] documentation to support this oral statement. The financials presented by [CashCall] during the Meeks testimony was for the entire company as to all of its loan products during the years of the Class Period, and none had profits or losses broken out [by] loan product." The court found similar problems with the testimony of CashCall's expert James, who testified that CashCall's profitability was " 'below median' of the subprime lending market" but "conceded that the financial statements were for the company over all" and that he "had no data as to the $2600 unsecured loan products alone."

Nor was the trial court persuaded the high interest rates on CashCall's $2,600 loan were justified by the company's overhead costs, including its advertising budget. The court found CashCall's overhead in general was lower than conventional lenders, as all transactions were done online, and all communications were made by telephone or online through CashCall's centralized operation. The court further concluded advertising costs were not a true cost of making or administering the loans, as "the vast majority of the people who responded to the advertisements by 'making the call' to CashCall ultimately did not apply, or did apply and were rejected."

In addressing CashCall's proffered justification that it had to charge high prices because it was providing a service for high-risk borrowers, the trial court remarked: "As a matter of public policy, our society does not require or condone that every human 'demand' be satisfied with 'supply.' In California there are needs and desires that people must suffer without

19

fulfillment, for the protection of themselves and/or other members of society. Other needs and desires are also denied fulfillment for the sake of our environment or against cruelty." The court further noted that CashCall's justification was belied by the fact that it did not lend to everyone who applied, rejecting the vast majority (70 percent) of applicants. In the court's view, CashCall "attempt[ed] to reap money through onerous loan contracts preying upon financially desperate people who were not creditworthy."

CashCall does not contend the findings above are unsupported by substantial evidence. Rather, CashCall maintains the trial court's analysis was flawed because (1) the court did not consider the contextual reasons for why CashCall charged high interest rates; and (2) the court considered improper factors, including post-loan evidence and matters of public policy that are within the exclusive province of the Legislature. As we shall explain, CashCall fails to convince us of the perceived error.

### a. Highly Dependent on Context

The determination of the substantive unconscionability of a loan is highly dependent on contextual factors such as the cost of the loan, the lender's inconvenience in issuing it, the loan's true value, and the lender's profitability. (*De La Torre, supra*, 5 Cal.5th at pp. 976, 983; see *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 927 (*Perdue*).)

CashCall contends the trial court failed to properly consider the high default risks the company faced in loaning to credit-impaired borrowers. In so arguing, CashCall highlights *De La Torre*'s comment that evidence of "default-prone" borrowers "tends to push away from a finding of substantive unconscionability" of interest rates. (*De La Torre, supra*, 5 Cal.5th at p. 983.) Notably, however, the high court did not hold that such evidence defeats a claim of price unconscionability as a matter of law. Indeed, a key takeaway

20

from *De La Torre* is that unconscionability cannot be decided based on any single factor. (*Id*. at p. 984.) Nor did *De La Torre* suggest that a trial court cannot probe whether a proffered justification based on high default risk is credible and valid based on the actual circumstances of the case.

That is what the trial court did here. It considered the evidence that CashCall faced a high rate of default in extending the $2,600 loan to credit-impaired borrowers but concluded this justification was "not a sufficient basis" for the exorbitant interest rates charged because CashCall "never adjusted its terms *based upon the default rate*—on the contrary, the evidence is that it adjusted its *underwriting criteria* based upon the default rate, but did not decrease or increase its *contractual terms* to the borrowers." The court further noted that "CashCall had a default rate of 35% to 40% at the time [it] decided to increase its loan interest rate to 96%. Yet, CashCall had that *same* default rate at the time [it] decided to increase its interest rate to 135% in July 2009. Indeed, Meeks testified that **during the entire Class Period, CashCall's default rate stayed the same *regardless of the interest rate charged to customers*.** Even borrowers with better FICO scores were charged the same high interest rates, rather than adjusting the loan terms (including interest) based upon the particular individual's creditworthiness." (Fn. omitted.) In other words, the court weighed the high default risk as a relevant factor but concluded it did not adequately correlate to—or thereby justify—the specific interest rates that CashCall decided to charge for the class loans. Nothing in the court's analysis contravenes *De La Torre*'s admonition to view the challenged interest rates in context.

CashCall next contends the trial court failed to consider evidence regarding the company's costs of doing business. Specifically, CashCall maintains the court erred in disregarding overhead costs such as advertising,

payroll, and underwriting on the grounds that " 'these business costs have nothing to do with the "risk" of making these loans to subprime borrowers, and cannot be the basis for justifying high interest rates or other related terms.' " Again, we are not persuaded.

As *De La Torre* held, courts may "examine components of a lender's costs including its 'cost of obtaining the money lent' and expenses incurred 'in making and administering the loan.' " (*De La Torre, supra,* 5 Cal.5th at p. 983.)[4] Here, the trial court found—and CashCall does not dispute—that CashCall "did not present any evidence as to the actual dollar cost for making and administering these $2600 loans at the time." The court noted CashCall did not take in deposits like a bank and "was purely a lender" that used investments from its founder and a loan syndicate to fund the loans. The court also concluded that CashCall's overhead costs were lower than conventional lenders because all transactions were done by telephone or online, and CashCall's operations were centralized. The record amply supports these factual findings.

CashCall takes particular issue with the trial court's conclusion that the company's advertising costs "were not a true 'cost' of making or administering the loans." CashCall surmises this finding merely reflected the court's "policy-based disapproval of CashCall's business model," but we decline to draw that inference in CashCall's favor. CashCall further complains the court "cited no law—and we have found none—for the premise

---

4     In so holding, *De La Torre* relied on a law review article on the use of the unconscionability standard in regulating interest rates. (See *De La Torre, supra,* 5 Cal.5th at p. 983, citing Bender, *Rate Regulation at the Crossroads of Usury and Unconscionability: The Case for Regulating Abusive Commercial and Consumer Interest Rates Under the Unconscionability Standard* (1994) 31 Hous. L. Rev. 721.)

that only risk-related costs are relevant to justify a price." But the court's scrutiny of the advertising cost evidence was consistent with *De La Torre*'s holding that courts must engage in a fact-specific and highly contextual inquiry into all relevant circumstances, including the basis and justification for the challenged price. (*De La Torre, supra*, 5 Cal.5th at pp. 976, 983.) Here, the court looked closely at the evidence of CashCall's advertising costs (including the fact that the vast majority of the consumers who responded to the advertisements never obtained loans from CashCall) and concluded those costs had little to do with why the company set the interest rates as high as it did. Conceivably, any cost incurred by CashCall could be said to contribute in some way to its loan business, but that does not compel the conclusion that those expenses were "incurred 'in making and administering the loan.' " (*De La Torre*, at p. 983; see Bender, 31 Hous. L. Rev. 721, at p. 775 [ "[a] lender's unique costs of operation are not relevant."].) On the record before us, CashCall fails to persuade us that the trial court erred in drawing the line where it did.

CashCall next contends the trial court erred by making no finding as to the company's *actual* profits from the $2,600 loan and focusing instead on its 15 to 20 percent profitability *target*. Though CashCall acknowledges that excess profitability may support a finding of substantive unconscionability, CashCall argues it was plaintiff's burden to show excess profitability, which he did not do. Instead, it contends, the only evidence at trial regarding profits was the testimony of CashCall's witnesses that profits were modest (seven to eight percent). CashCall argues that while the court was entitled to (and did) disbelieve this evidence, "that disbelief would not create any basis for a finding that the class loans were more profitable than the evidence showed."

23

CashCall's attempt to frame this issue as a failure of plaintiff's burden of proof is unavailing.  The main authority relied upon by CashCall—*Perdue*, *supra*, 38 Cal.3d 913—did not articulate a burden-shifting framework for unconscionable price claims.[5]  What CashCall refers to as the " '*Perdue* factors' " (e.g., lender's costs and inconvenience, borrower's credit impairment) derives from a portion of the decision where the Supreme Court rejected the defendant's claim that a price equal to market price is not unconscionable as a matter of law.  (*Perdue*, at pp. 926–927.)

As *Perdue* explained, "The courts look to the basis and justification for the price [citation], including 'the price actually being paid by . . . other similarly situated consumers in a similar transaction.' [Citation.]  The cases, however, do not support the defendant's contention that a price equal to the market price cannot be held unconscionable.  While it is unlikely that a court would find a price set by a freely competitive market to be unconscionable [citation], the market price set by an oligopoly should not be immune from scrutiny.  Thus courts consider not only the market price, but also the cost of the goods or services to the seller [citations], the inconvenience imposed on the seller [citation], and the true value of the product or service." (*Perdue*, *supra*, 38 Cal.3d at pp. 926–927.)  This, in turn, was the basis for *De La Torre*'s statement that courts may "consider whether there are market imperfections that make it less likely that the price was set by a 'freely

---

[5]     *Perdue* was a class action alleging unconscionable charges imposed by a bank for checks without sufficient funds (NSF charges).  (*Perdue, supra*, 38 Cal.3d at p. 920.)  The Supreme Court reversed the trial court's order sustaining the bank's demurrer without leave to amend, concluding "the parties should be afforded a reasonable opportunity to present evidence as to the commercial setting, purpose, and effect of the signature card and the NSF charge in order to determine whether that charge is unconscionable." (*Id.* at pp. 928–929.)

competitive market' and therefore more susceptible to unconscionability."
(*De La Torre*, *supra*, 5 Cal.5th at p. 984, citing *Perdue* at p. 927.)

Consistent with *Perdue* and *De La Torre*, plaintiff presented evidence that there was no market competition for CashCall's $2,600 loan, and that the interest rates were the result of deliberate business decisions by the company based on its internal objectives for aggressive growth and high profits. This showing was sufficient to trigger the trial court's scrutiny as to how the interest rates were set, taking into consideration the various factors discussed in *De La Torre* and *Perdue*. (See *De La Torre*, *supra*, 5 Cal.5th at p. 976; *Perdue*, *supra*, 38 Cal.3d at pp. 926–927.) But to CashCall's point, nothing in *Perdue* establishes such a rigid burden-shifting framework for the court's consideration of these factors that we must conclude plaintiff failed in his initial burden of proof, and that the court consequently erred in ruling in his favor. As CashCall acknowledges, the trial court considered, but rejected, CashCall's evidence of modest profitability due to CashCall's failure to support this claim with documentation that properly isolated the company's profits from its $2,600 loan product. On this record, the court's decision was based on an appropriate consideration of the relevant factors.

Finally, CashCall contends the trial court erred by "entirely ignor[ing]" the evidence that CashCall had competitors and dismissing them as " 'minor players.' " This argument is meritless. The court expressly recognized that CashCall had potential competitors near the end of the class period but concluded this was insufficient to prove the interest rates were formulated in a competitive market. Substantial evidence supports this finding. For instance, CFO Meeks testified at his deposition that CashCall faced no competitors offering subprime installment loans throughout the class period and that any market entrants were only "minor players" that arose late in

the class period. At trial, he could not name a single competitor during the class period, and he reiterated there were "no direct competitors, no competitors" until "the end of the class period . . . when we would start to see some competition that could come from payday lenders who now offered installment loans" as well as some "CashCall look-alike companies that were starting to come into the marketplace." However, Meeks could not answer when those competitors entered the market, what their market share was from 2009 to 2011, or whether CashCall lost any market share to them. And he squarely testified that CashCall did not reduce its interest rates in response to the presence of competitors in the market. The record amply supports the trial court's conclusion that CashCall faced no real market competition for the class loans.

### b. The Trial Court Did Not Consider Improper Factors or Evidence

CashCall contends the trial court improperly relied on post-loan evidence, violating the principle that unconscionability must be determined at the time contracting. First, CashCall points to the court's calculation of the loans' maximum possible price, arguing that this price would only be imposed if the borrower chose to pay only the minimum payment over the full term of the loan. We disagree that this was post-loan evidence. Rather, it was a present calculation of the full potential impact of the loan based on its express terms. This was entirely consistent with the court's role in scrutinizing the loan's substantive terms for harshness.

CashCall also contends the trial court erroneously considered post-loan evidence regarding plaintiff's reaction to CashCall's collection efforts. Specifically, the court described CashCall's collection efforts, the consequences of plaintiff's default (e.g., impact on his credit report), and plaintiff's assertion that "he would not have taken out the CashCall loan if he

knew then what he knows now." CashCall fails to persuade us of any error, as the court did not base any of its specific unconscionability findings squarely on this testimony. Nor does CashCall demonstrate that this evidence was irrelevant to any other issues at trial. The court could permissibly have concluded the evidence reinforced plaintiff's contention that at the time of entering into the loans, CashCall knew and expected a significant percentage of the borrowers to default and maintained collections operations for that contingency.

CashCall further argues the trial court improperly considered public policy factors about subprime borrowers. According to CashCall, the court found the loans unconscionable based on what amounted to a policy determination that for their own good, high-risk borrowers who need immediate money should never be able to obtain loans at high interest rates. We remain unconvinced that the court's decision was based on improper factors. The remarks in question were in direct response to CashCall's argument that it was simply providing a product for which there was a demand. The court found this proffered justification to be "watered down" by various adjudicated facts, including that CashCall did not lend to everyone who applied, and that CashCall's business model was not consistent with general reasonable business practices. We must also view the court's remarks in conjunction with its many other detailed findings addressing how the challenged loans were formulated and made. Viewed thusly, the court's decision did not amount to a policy judgment against subprime lending but instead reflected a fact-specific adjudication that CashCall's interest rates were unconscionably and unjustifiably high.

*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 (*California Grocers*) does not compel otherwise. There, a grocers association

sued a bank, alleging its $3 fee for deposited items returned (DIR) was unconscionably high. (*Id.* at pp. 209–210.) The trial court found the fee unconscionable and issued an injunction requiring the bank to lower the fee to not more than $1.73 for 10 years. (*Id.* at p. 212.) The appellate court concluded the injunction exceeded the trial court's authority because the doctrine of unconscionability only provides "a defense to enforcement of a contract, and normally cannot be used offensively to obtain mandatory injunctive relief." (*Id.* at p. 217.) The court further explained that "[j]udicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees" because such questions of "economic policy"—"whether service fees charged by banks are too high and should be regulated"—" 'is primarily a legislative and not a judicial function to determine economic policy.' " (*Id.* at p. 218.)

Here, in contrast, the trial court did not issue a mandatory injunction specifying the interest rates CashCall could permissibly charge. Rather, the court adjudicated the question of whether CashCall's particular interest rates were unconscionable. Unlike the trial court's attempted oversight of the challenged fee in *California Grocers*, the court's action here is expressly authorized by a statute that extends the doctrine of unconscionability to consumer loans like the class loans in question. (§ 22302, subd. (a); Civ. Code, § 1670.5.) And *De La Torre*, of course, made clear that under section 22302 and Civil Code section 1670.5, it is entirely within the province of the courts to determine whether interest rates, like any other price terms, are unconscionable. (*De La Torre*, *supra*, 5 Cal.5th at pp. 976–977, 979.)

In sum, CashCall fails to demonstrate the trial court erred in finding the class loan contracts to be procedurally and substantively unconscionable.

## B. Restitution/Value of Loans

Business and Professions Code section 17203 "authorizes the court to fashion remedies to prevent, deter, and compensate for unfair business practices." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 176 (*Cortez*).) "While the scope of conduct covered by the UCL is broad, its remedies are limited," and " '[p]revailing plaintiffs are generally limited to injunctive relief and restitution.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144.) Restitution may be awarded "to restore to any person in interest any money or property . . . which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.) "[T]he equitable remedies of the UCL are subject to the broad discretion of the trial court." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 371; see *Cortez*, at p. 180 [court's discretion to grant restitution "is very broad."].) "[T]he trial court's imposition of restitution . . . will not be disturbed absent an abuse of discretion." (*People ex rel. Harris v. Aguayo* (2017) 11 Cal.App.5th 1150, 1160 (*Aguayo*).)

Here, the trial court fashioned a restitution award requiring CashCall to return to the class members all amounts they paid above the principal amount of their loans and the $75 origination fee. The court rejected CashCall's argument that plaintiff and the class were required to prove an " 'offset' of 'value' using a 'price premium' approach," finding the cases cited by CashCall involving the "unfair" and "deceptive" prongs of the UCL were not controlling in the instant action under the UCL's "unlawful" prong, where the principal amount of the loan was "a sum certain." According to the court, "money that belongs to the plaintiff pursuant to statute and does not belong to the defendant pursuant to statute is subject to restitution. There is no weighing of values."

29

CashCall insists the trial court erred because the law requires an offset for the value of the loans to the class members, including the "time value" of the loans, i.e., "the principle that the current value of a right to receive a series of future payments is ordinarily less than the sum of those payments." (*People v. Arce* (2014) 226 Cal.App.4th 924, 929.) In CashCall's view, by obtaining a lump sum loan of $2,525, class members received an unspecified amount of time value beyond the principal amount of the loan, as well as the "special value" of funds when few other options were available to them. Maintaining that class members were entitled to recover only the difference between the amount of interest CashCall charged and an amount of interest that was not unconscionable, CashCall asserts plaintiff failed to provide a suitable measure of a non-unconscionable rate.[6] As we shall explain, CashCall fails to establish that the trial court was required by law to apply a time value discount in fashioning restitution under the UCL.

CashCall's argument is based on two decisions, which we briefly discuss. *In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116 (*Vioxx*) was a class action under the False Advertising Law (Bus. & Prof. Code, § 17500) of the UCL and the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.), alleging the manufacturer of a pain relief drug, Vioxx, made

---

[6] Here we note that plaintiff's proposed statement of decision recounted expert McFarlane's testimony regarding two possible measures of restitution: first, the total interest paid by the class above paid principal; and second, an approach that would apply the 36 percent interest cap adopted by the Legislature in 2019 (§ 22304.5; Stats. 2019, ch. 708, § 5) as "an appropriate benchmark interest rate for loan valuation and restitution purposes." Of the two methods, plaintiff urged the court to employ methodology 1, which did not attempt to approximate a non-unconscionable interest rate as in methodology 2. The trial court eventually adopted methodology 1, concluding the 36 percent cap of methodology 2 was "a matter of policy or of legislative negotiation, not an adjudication of conscionability."

misrepresentations to the public downplaying or ignoring the drug's risks of adverse cardiovascular effects. (*Vioxx*, at p. 123.) There, the plaintiffs specifically sought to recover the difference in price between what they paid for Vioxx and what they would have paid for a safer, equally effective, pain reliever (*id.* at p. 120), and in support of their motion for class certification, they advanced a theory that if generic naproxen were used as a comparator drug, the price differential could be calculated on a classwide basis (*id.* at p. 124). In rejecting the plaintiffs' theory and affirming the denial of class certification, the Court of Appeal highlighted the trial court's finding, based on substantial evidence, that naproxen was not a valid classwide comparator, and that the determination of a proper comparator drug was too patient-specific to be amenable to class treatment. (*Id.* at p. 136.)

Similarly, *In re Tobacco Cases II* (2015) 240 Cal.App.4th 779 (*Tobacco II*) was a consumer class action under the UCL and the FAL alleging a cigarette manufacturer knowingly used deceptive advertising to imply that its light cigarettes were less unhealthy than non-light cigarettes. (*Tobacco II*, at p. 784.) On appeal from a defense judgment after a bench trial, the plaintiffs did not challenge the trial court's findings that they and the class received value from the purchased cigarettes apart from the deceptive advertising, or that they failed to submit evidence to "establish the difference between the price they paid for Marlboro Lights and the actual value they received, the measure of restitution utilized in *Vioxx*." (*Tobacco II*, at p. 791.) Although the appellate court agreed with the plaintiffs "that *Vioxx* does not purport to set forth the exclusive measure of restitution *potentially* available in a UCL case" (*id.* at p. 792), the court held the trial court had properly employed the *Vioxx* measure because it was plaintiffs' counsel who "adopted" that measure during witness questioning and closing arguments. (*Tobacco*

*II*, at p. 794.) "Given this scenario, plaintiffs cannot reasonably fault the court for applying the *Vioxx* measure of restitution." (*Ibid.*)

The *Tobacco II* court then went on to consider and reject the plaintiffs' alternative theory that they were entitled to a full refund of the purchase price, regardless of the value of the products they purchased. (*Tobacco II*, *supra*, 240 Cal.App.4th at pp. 794–802.) The court concluded the full refund theory was not available because it was undisputed the purchased cigarettes had some value apart from the deceptive advertising. (*Id.* at pp. 794–796.) The court further rejected the plaintiffs' argument that restitution could be ordered solely for the purpose of deterrence, without a showing of loss. (*Id.* at pp. 799–802.)

We, like the trial court, conclude *Vioxx* and *Tobacco II* are materially distinguishable as fraudulent prong UCL cases in which the plaintiffs expressly asserted an excess-over-value theory of restitution but provided no satisfactory way to measure the value of the products apart from the deceptive advertising. Those cases do not compel application of the *Vioxx* measure of restitution in every UCL case—indeed, *Tobacco II* expressly acknowledged that *Vioxx* did not set forth an exclusive measure of UCL restitution (*Tobacco II*, *supra*, 240 Cal.App.4th at p. 792)—let alone in a case such as this where the amount of money lost by the victims of an unlawful business practice is readily measurable.[7]

---

[7]     Likewise, none of the other cases cited by CashCall applied the principle of the time value of money to reduce a statutory restitution award. (See *City of Clovis v. County of Fresno* (2014) 222 Cal.App.4th 1469, 1480 [discussing statute authorizing prejudgment interest on damages awarded against county]; *Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 644 [discussing time value of money in connection with administrative review official's calculation of change in control benefit under Employee Retirement Income Security Act of 1974]; *Interinsurance Exchange of the*

32

Consistent with the UCL, the restitution award fashioned by the trial court below "restore[s]" to the class a "measurable amount" of "money" that was "acquired by means of" CashCall's unlawful business practices. (Bus. & Prof. Code, § 17203; see *Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 339 [restitution under UCL operates "to return to a person those measurable amounts which are wrongfully taken by means of an unfair business practice" (italics omitted)].) The amount of the class members' payments above principal and the $75 origination fee was calculated by expert McFarlane based on CashCall's loan transaction data, and that figure is not in dispute. By this measure, CashCall would be paid back the principal amount of funds it had loaned, but not the interest payments it acquired from the class using rates that were unconscionable—and therefore unlawful. (§ 22302, subd. (a); Civ. Code, § 1670.5.) This straightforward measure of restitution, supported by substantial evidence, comports with the UCL by placing CashCall's victims back in possession of the interest payments they made as a direct result of CashCall's unlawful business practice.

Contrary to CashCall's assertions, restitution awards have been upheld on appeal notwithstanding a trial court's discretionary refusal to make a value-based offset. In *Aguayo*, the defendants operated a real estate scam through which they fraudulently acquired title to and possession of several distressed properties, improved the properties, and then rented them to unsuspecting third parties. (*Aguayo, supra*, 11 Cal.App.5th at pp. 1155–1157.) In a UCL enforcement action by the State of California (People), the trial court removed defendants' legal and recorded claims to the properties

---

*Automobile Club v. Superior Court* (2007) 148 Cal.App.4th 1218, 1231 [interpreting "premium" under Insurance Code as not including interest charged for time value of money].)

and ordered them to pay over $2.6 million in restitution, which included rents received by defendants and the court-appointed receiver. (*Aguayo*, at pp. 1167–1168.) On appeal, the defendants argued the restitution of rents was unjust because the victims would be receiving "a windfall . . . since they will have already received back more than the status quo ante with the improved properties." (*Id.* at p. 1168.) The appellate court disagreed, concluding that the trial court had broad discretion to fashion a restitution award that returned to the victims the funds in which they had an ownership interest, and that its "decision to return rents to the rightful owners of property was in line with this goal." (*Ibid.*)

*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102 (*Beaumont*) is also instructive. There, the People brought a UCL action against mobile home park owners who unlawfully forced tenants to sign long-term leases so that the owners could avoid a rent control ordinance. (*Beaumont*, at pp. 110–111.) The trial court entered judgment in favor of the People and ordered the park owners to pay $525,000 in restitution of "all 'above-Ordinance' rents charged to tenants in unlawful long-term leases." (*Id.* at p. 132.) On appeal, the owners argued the restitution formula was "flawed because it fails to accomplish the fundamental object of restitution, which is 'to place the parties in the same position they would have been in before the challenged contract was entered into.' " (*Id.* at p. 134.)

In rejecting the park owners' status quo argument, the *Beaumont* court explained, "Where restitution is ordered as a means of redressing a statutory violation, the courts are not concerned with restoring the violator to the status quo ante. The focus instead is on the victim. 'The status quo ante to be achieved by the restitution order was to again place the *victim* in

34

possession of that money.' [Citation.] 'The object of [statutory] restitution is to restore the status quo by returning to the *plaintiff* funds in which he or she has an ownership interest.' [Citation.] 'The purpose of the civil remedy is to allow recovery of the excess paid and to prohibit the seller from receiving and keeping such excess.' [Citation.] Moreover, in contrast to contract restitution, statutory restitution is not solely 'intended to benefit the [victims] by the return of money, but instead is designed to penalize a defendant for past unlawful conduct and thereby deter future violations.' " (*Beaumont*, *supra*, 111 Cal.App.4th at pp. 134–135.)

The restitution award in the instant case, like those in *Aguayo* and *Beaumont*, fully aligns with the goals of the UCL. The trial court's "carefully crafted restitution remedy is based on appropriate factors, and it accomplishes the statutory objective of restoring to the victims the sums acquired through" CashCall's unlawful business practices. (*Beaumont*, *supra*, 111 Cal.App.4th at p. 135.) CashCall's insistence that the trial court offset the award for the loans' value is akin to the arguments unsuccessfully asserted in *Aguayo* and *Beaumont* that the restitution awards were flawed because the victims obtained more than they would have under the status quo ante. As *Beaumont* explained, the status quo principles that generally apply to contractual restitution do not strictly apply to statutory restitution, which focuses on restoring the victims' lost money or property and deterring the wrongdoer from committing future violations. (*Beaumont*, *supra*, 111 Cal.App.4th at pp. 135–136.)

Indeed, CashCall's excess-over-value approach is notable for its effect of returning the *violator* to the position it would be in had it chosen to follow the law in the first place. As *Beaumont* explained, that is not the appropriate focus of the courts in fashioning restitution under the UCL. (*Beaumont*,

*supra*, 111 Cal.App.4th at pp. 135–136.) Perhaps more to the point, under CashCall's approach, the company would still end up being paid for its lending practices, only at a fair market rate rather than the unconscionable rate it imposed. The trial court could, in the reasonable exercise of its discretion, conclude such an award would have little to no deterrence value against CashCall or any other business in the same position. " 'To permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved.' " (*Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 451.)

In sum, the trial court had no legal obligation to apply a value offset in CashCall's favor. Rather, case law supports the court's refusal to do so on the grounds it would detract from the statutory goals of restoring all unlawfully acquired funds to the class and deterring future violations by CashCall.[8]

**C. Injunction**

CashCall argues the trial court's injunction cannot stand because there was no evidence at trial that any class loans were still subject to collection. According to CashCall, the most recent class loans would have matured no later than 2015, and there was no evidence that CashCall still owns any class loans, or that any third party who currently owns a class loan has attempted to collect recently or would do so in the future. CashCall again fails to demonstrate error.

---

[8] In light of our conclusion, we need not address CashCall's additional contention that the trial court erred by relying on various penalty provisions of the California Financing Law (§ 22000 et seq.) to support the restitution of interest payments without a value offset.

Trial courts enjoy "broad authority" to enjoin conduct that violates Business and Professions Code section 17200. (*Colgan v. Leatherman Tool Group* (2006) 135 Cal.App.4th 663, 702.) But injunctive relief is available only where there is "a threat that the wrongful conduct will continue. 'Injunctive relief will be denied if, at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct.' " (*Ibid*.) " 'The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.' " (*Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914, 925.)

Here, the record reflects that since the inception of this lawsuit, plaintiff has sought an injunction against any further collection efforts on the class loans. At trial, expert Saunders and CFO Meeks testified as to CashCall's maintenance of an extensive collections unit (part of its business model anticipating substantial defaults among the class loans). Although Meeks testified that CashCall was no longer originating any new loans at the time of trial, he gave no indication that CashCall was no longer collecting on the class loans. On this record, the trial court could reasonably infer from CashCall's failure to offer evidence that collections had ceased that there remained a reasonable probability of future collections attempts by CashCall or third parties who owned or were assigned the challenged loans. The court did not abuse its discretion, clearly or otherwise, in issuing the injunction.

**D. Decertification**

CashCall argues that even if the trial court did not err in its substantive rulings and remedies, the court should have granted CashCall's motion to decertify the class because of the predominance of individual issues

37

and the existence of an irreconcilable conflict between the class members who are to receive restitution and those who will not. We disagree.

### 1. *Governing Law*

Class certification is authorized where the following elements are established: "(1) 'the existence of an ascertainable and sufficiently numerous class'; (2) 'a well-defined community of interest'; and (3) 'substantial benefits from certification that render proceeding as a class superior to the alternatives.' [Citations.] 'The community of interest requirement involves three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Sarun v. Dignity Health* (2019) 41 Cal.App.5th 1119, 1131.) "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.)

"After certification, a trial court retains flexibility to manage the class action, including to decertify a class if 'the court subsequently discovers that a class action is not appropriate.' [Citations.] To prevail on a decertification motion, a party must generally show 'new law or newly discovered evidence showing changed circumstances. [Citation.] A motion for decertification is not an opportunity for a disgruntled class defendant to seek a do-over of its previously unsuccessful opposition to certification. "Modifications of an original class ruling, including decertifications, typically occur in response to a significant change in circumstances, and '[i]n the absence of materially changed or clarified circumstances . . . courts should not condone a series of rearguments on the class issues[.]' [Citation.]" ' [Citation.] A 'class should be decertified "only where it is clear there exist changed circumstances

38

making continued class action treatment improper." ' [Citation.] [¶] A party moving for decertification generally has the burden to show that certification is no longer warranted, and courts have broad discretion in ruling on this issue.' " (*Kight v. CashCall, Inc.* (2014) 231 Cal.App.4th 112, 125–126 (*Kight*).)

### 2. *Analysis*

CashCall contends individual issues varied widely as to substantive unconscionability factors such as the class members' financial circumstances and risk profiles and the value of the loans to them; and procedural unconscionability factors such as class members' individual level of sophistication, whether they had previously taken out a CashCall loan, their payment experience with CashCall, and whether they had access to alternative forms of credit. We are not persuaded.

Although CashCall's arguments are based on a trial record that did not exist at the time of the initial certification motion, we note they reiterate substantially the same points that CashCall raised in its opposition to class certification—e.g., that individual issues would predominate as to borrower sophistication, alternative loan availability, surprise, and the value of the loans to the borrowers. That CashCall cites some examples of individualized evidence from trial that support its earlier opposition to certification does not, in our view, demonstrate "a significant change in circumstances" that "materially changed or clarified" how the court should view its initial certification order. (*Kight*, *supra*, 231 Cal.App.4th at pp. 125–126.) The trial court could reasonably have rejected CashCall's decertification showing as insufficient, since a certification order is not erroneous merely because "the record evidence of predominance [is] less than determinative or conclusive." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 338 (*Sav-*

*On*).) "Predominance is a comparative concept, and 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.' Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Id.* at p. 334.)

The record here reflects the trial court oversaw an efficient, 14-day trial that involved many common issues regarding CashCall's liability, including how it formulated, advertised, and extended its $2,600 loan to the class. In doing so, the court evidently and reasonably concluded that any differences among class members did not, on balance, materially impact the court's conclusions regarding their overall financial vulnerability and sophistication vis-à-vis CashCall. For instance, the fact that some class members may have had access to alternative loan products pales in comparison to the testimony of CFO Meeks that the $2,600 loan product was "unique" and had no comparable alternatives for much of the class period. Moreover, CashCall's insistence that the loans' time value presented predominantly individualized issues fails because, as discussed, the trial court was not required to offset for time value in fashioning a restitution award.

CashCall's conflict argument fares no better. While it is true that class representatives cannot adequately protect the class if their interests are antagonistic to or in conflict with the objectives of those they seek to represent, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 (*Richmond*).) Here, the trial court reasonably concluded there was no fundamental antagonism between plaintiff and the class or among the class members. All stood to benefit identically from the court's decision that the interest rates on CashCall's

$2,600 loans were unconscionable.  The distinction in restitution among the class members who paid back the principal amount of their loans and those who did not reflects not so much a conflict that goes to the very subject of the litigation, but rather, a variance in recovery amounts.  As the California Supreme Court has explained, " '[differences] which do not raise questions as to the very legitimacy of the class action process, . . . but which merely reflect variances in view as to the proper outcome of a suit, do not provide reason for a court to refuse to hear a class suit.' "  (*Richmond*, at p. 473; see *Sav-On*, *supra*, 34 Cal.3d at p. 338 [" 'a community of interest does not depend upon an identical recovery' "].)

For these reasons, we conclude the trial court did not abuse its discretion in denying the posttrial motion for decertification.

**DISPOSITION**

The judgment is affirmed.  Plaintiff is entitled to his costs on appeal.

_____
Fujisaki, J.

I CONCUR:

_____
Rodríguez, J.

*De La Torre v. Cashcall, Inc.* (A161877)

**TUCHER, P. J., Dissenting**

I agree with my colleagues' resolution of most of the issues in this case, but part company with them on the question of whether plaintiff has established that these loans were substantively unconscionable.  In my view, the trial court's analysis of the terms of CashCall's $2,600 unsecured consumer loans improperly disregards the teaching of our high court that "[i]f . . . the interest rate is high because the borrowers of the loan are credit-impaired or default-prone, then this is a justification that tends to push away from a finding of substantive unconscionability." (*De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 983 (*De La Torre*).)  Here the trial court seems instead to have believed that loaning money to default-prone borrowers was itself unconscionable.

In exercising de novo review of the trial court's unconscionability determination, we defer to the trial court's findings of fact where they are supported by substantial evidence. (*Ramirez v. Charter Communications, Inc.* (2024) 16 Cal.5th 478, 493.)  Here, the trial court appears to have credited the testimony of CashCall's Chief Financial Officer Delbert Meeks that CashCall lost money on its $2,600 loans when it charged 79 percent, and then 87 percent, annual interest.  Because of high business costs and losses due to defaults, CashCall reportedly did not turn a profit on these loans until it increased its annual interest rate to 96 percent in 2005, and even at this interest rate, this line of business was again posting losses within two years.  As Cashcall's cost of capital doubled and its default rates climbed during the Great Recession, CashCall again raised its interest rate, this time to 135 percent.  I acknowledge that interest rates of 96 and 135 percent are exceedingly high, but I cannot find they are " 'so one-sided as to shock the conscience' " (*De La Torre*, *supra*, 5 Cal.5th at p. 984) when the product line

1

was only intermittently profitable for CashCall. I acknowledge that Cashcall was not increasing its interest rates in response to competitive market conditions—since, as the trial court found, there was no other business offering a competitive loan product—but that does not mean the company's response to market realities was unconscionable. And I would not ignore, as the trial court did, that the average annual interest rate for an unsecured pay day loan was *much* higher—426 percent, according to data from the California Department of Corporations.

In addition to its high interest rates, the trial court faulted CashCall for choosing a loan repayment term of 36 or 42 months, rather than a shorter term. But in concluding that the longer repayment period "yields harsh results for the borrower," the trial court failed entirely to reckon with the consequence of requiring CashCall to adopt a shorter repayment period, namely that minimum monthly payments would climb correspondingly, and the loans would become unaffordable for some portion of CashCall's clientele.

The trial court seemed peculiarly unconcerned with an unconscionability ruling that would drive businesses like CashCall from the market or require them to drop large portions of their customer base. "In California there are needs and desires that people must suffer without fulfillment, for the protection of themselves and/or other members of society," the court declared. I think our high court has tasked us with being more sensitive to economic context and less imperious. (See *De La Torre*, *supra*, 5 Cal.5th at p. 991 ["Our respect for the Legislature's prerogative to shape economic policy through legislation is why we have kept [unconscionability] doctrine relatively narrow, and are careful to observe its nuances"].) Courts should bear in mind "concerns about freedom of contract, the importance of commerce, and continued access to credit"—considerations that explain

2

why "few courts have ever declared contracts unconscionable," and the *De La Torre* court could identify only one court that had annulled or reformed as unconscionable a loan with a "shockingly high rate of interest." (*Id.* at p. 992.) The facts of that one case were considerably more egregious than the facts here: an interest rate of 200 percent, which was ten times the prevailing market rate, on a *secured* loan. (*Ibid.*; *Carboni v. Arrospide* (1991) 2 Cal.App.4th 76, 82–84.)

For these reasons and more, I would not hold that plaintiffs established unconscionability here.

_____
Tucher, P. J.

3